985 F.2d 824
 1994 A.M.C. 1203, 23 Envtl. L. Rep. 20,762
 Summersgill DARDAR, Plaintiff,
Raymond Serigney, Luke Billiot, Joe Billiot, Deborah Taylor,
Whitney Billiot, Plaintiffs-Appellants,
The State of Louisiana, Intervenor-Appellant,
v.
LAFOURCHE REALTY CO., INC., John Plaisance & Sons, Inc.,
Alex J. Plaisance, Jr., Col. Eugene S.
Witherspoon, Lt. Gen. E.R. Heiberg III
and John O. Marsh, Jr.,
Defendants-Appellees.
Summersgill DARDAR, Plaintiff,
Raymond Serigney et al., Plaintiffs-Appellants,
v.
LAFOURCHE REALTY CO., INC. et al., Defendants,
and
Col. Eugene S. Witherspoon et al., Defendants-Appellees.
 No. 91-3522.
 United States Court of Appeals,
Fifth Circuit.
 March 15, 1993.
 
 David C. Kimmel, Asst. Atty. Gen., William J. Guste, Jr., Atty. Gen., Baton Rouge, LA, for State of La.
 Michael Osborne, Osborne, McComiskey & Gobert, New Orleans, LA, for Serigney, Billiot & Taylor.
 William R. Pitts, P. Albert Bienvenu, Jr., New Orleans, LA, for Lafourche Realty, John Plaisance & Sons, Inc. & Alex Plaisance, Jr.
 Dirk D. Snel, Martin W. Matze, Washington, DC, for The Secretary of the Army, Chief of Engineers, U.S. Dept. of Army, District Engineer, New Orleans Dist. Dept. of Justice.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before HILL,[1] KING and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Plaintiffs, commercial fishermen, sued the Lafourche Realty Co., Inc. seeking the right to use a system of navigable waters controlled by Lafourche Realty through an arrangement of fences, gates, and levees. The State of Louisiana intervened, asserting a right of public use of the waters and claiming title to the water bodies and over twelve thousand acres of land under the waters.
 
 
 2
 Lafourche Realty, the record owner of the property, counterclaimed, asserting title to all property located within its patents, including the water bottoms. Lafourche Realty contends that the digging of a canal in 1948 and various more recent improvements have artificially created the waterways which remain privately owned. The district court found for Lafourche Realty, rejecting the State's title claim and, in a separate trial, denying Plaintiffs and the State any access to the water bodies. We affirm in part and vacate and remand in part.
 
 I. LOUISIANA'S CLAIM TO TITLE
 
 3
 We first address the State's title claim. The disputed property lies in southeast Louisiana in Lafourche Parish, east of Bayou Lafourche, northwest of Caminada Bay, several miles from the Gulf coast. According to joint trial stipulations, Lafourche Realty is the record owner of the land. Originally federal property, the property was selected by and approved to the State of Louisiana under one or more of the Swamp Land Grant Acts of 1849 and 1850, by which the United States conveyed to Louisiana "swamplands subject to overflow." Act of March 2, 1849, ch. 87, 9 Stat. 352 (1849); Act of Sept. 28, 1850, ch. 84, 9 Stat. 519 (1850). Louisiana authorized the State's alienation of lands "donated by Congress to the State of Louisiana, designated as sea marsh or prairie, subject to tidal overflow." Act of April 7, 1880, No. 75, § 11, 1880 La.Acts 85. The State conveyed the water bottoms by various transfers to Lafourche Realty's ancestors-in-title between 1861 and 1901. The State now argues that it nevertheless owns the water bottoms by virtue of its inherent sovereignty.
 
 A. Public Trust Lands and Waters
 
 4
 The State bases its title claim, first, on public trust jurisprudence and the "equal footing" doctrine. On equal footing with the original thirteen states, Louisiana, upon attaining statehood, received ownership of all navigable waters within its borders and all tide waters and the lands under them from the United States in public trust. See Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 479-81, 108 S.Ct. 791, 796-97, 98 L.Ed.2d 877 (1988). Thus, the first element of Louisiana's claim based on the equal footing doctrine depends upon whether waters that were navigable or subject to the ebb and flow of the tide covered any of the property in the year of Louisiana's statehood, 1812. The court rejected this claim upon finding that no natural navigable water bodies existed on the property in 1812 and that the land was not then subject to the ebb and flow of the tide. Appellants challenge both the factual finding and the legal standard employed by the district court.
 
 1. No Navigable Waters in 1812
 
 5
 The district court found that in 1812 none of the Lafourche Realty property was under waters that were navigable in fact.[2] This Court does not set aside a district court's factual findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings." Id. at 575, 105 S.Ct. at 1512. Unless we are left with the definite and firm conviction that a mistake has been committed, we accept the trial court's findings. Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A., 898 F.2d 1071, 1076 (5th Cir.), cert. denied, 498 U.S. 900, 111 S.Ct. 256, 112 L.Ed.2d 214 (1990).
 
 
 6
 The court's finding of non-navigability is supported by the testimony of Lafourche Realty's expert, Sherwood M. Gagliano, Ph.D., and official township surveys from later in the 1800's that do not depict any navigable water bodies on the property.
 
 
 7
 The State disparages the township surveys on the basis of its expert witness and nineteenth century maps showing the existence of lakes and streams northwest of Caminada Bay. The State's expert, Mr. Charles Coates, discredited the absence of water bodies on the township surveys. He explained that those early surveyors did not meander the waters either because of the instability of the terrain or because the interior marsh was not considered saleable. The State also strongly urges reliance upon Captain G.W. Hughes's 1842 Map of Military Reconnaissance and Survey, allegedly depicting lakes and streams corresponding in location to some of the contested water bodies; this lake complex reappears in later maps until 1870, a couple of years before the official township survey.
 
 
 8
 The court found, however, that the "complex of three-to-four lakes that some nineteenth-century maps portray ... are fictitious, at least to the extent the maps purport that any such water bodies lay within the Lafourche Realty Property." This finding was supported by Dr. Gagliano, who concluded that the four shallow lakes linked by a stream appearing on the Hughes map were sketched in "as an afterthought." The lack of detail on the Hughes map for the lakes shown on the subject property is striking. In contrast, other water bodies on the Hughes map (beyond the boundaries of the Lafourche Realty property) were depicted in minute detail with measured depths and with more meticulous renditions of the surrounding topography. See L.R. Ex. 43. Dr. Gagliano based his opinion in part on Captain Hughes's detailed field notes, which were devoid of a description of the four shallow lakes shown on the Hughes map.[3] Dr. Gagliano also regarded the series of maps drafted after the Hughes map from 1842 until about 1872 as "copy-cat maps"; they picked up the lakes sketched on the Hughes map, but the configuration of lakes on such maps was "derived from very poor information." 22 R. 75-76, 81. Dr. Gagliano opined that the Lafourche Realty property was historically floating trembling prairie, a category of land. Finally, some evidence suggested that the township surveyors indeed meandered the water bodies in preparing the official surveys, contrary to Mr. Coates's opinion.
 
 
 9
 The finding that the disputed land included no navigable water bodies in 1812 is based on substantial evidence. The court's decision to credit Dr. Gagliano's opinion and accord little weight to the testimony of Mr. Coates is not clearly erroneous. See Gulf Consol. Servs., 898 F.2d at 1077.
 
 2. Test of Navigability
 
 10
 The State next argues that the district court applied an incorrect legal standard to determine navigability. The State urges that the court ignored the test of Ramsey River Road Property Owners Ass'n, Inc. v. Reeves, 396 So.2d 873 (La.1981), namely, whether a water body may be used in its ordinary condition as a highway for commerce over which trade and travel may be conducted in the customary modes of trade and travel on water given the means of navigation at that time. 396 So.2d at 876. Considering nineteenth century means of navigation in south Louisiana, the State argues, the court should have easily found navigability.
 
 
 11
 The district court, specifically noting that under Ramsey River "certain shallow water bodies may be wide enough and contain enough water flow ... to sustain commercial activity such as floating lumber from a nearby sawmill," found, "the Lafourche Realty Property before 1902 did not contain any such water body." Even under a floating-lumber test of navigability,[4] the court determined that no navigable water bodies existed on the property. The State's claim that the court exacted too strict a standard of navigability is without merit. Accordingly, there is no error in the finding and conclusion that Louisiana acquired none of the Lafourche Realty property as navigable water bottoms in 1812.
 
 3. Ebb-and-Flow Tidelands at Statehood
 
 12
 Phillips Petroleum held that lands beneath waters influenced by the ebb and flow of the tide, whether navigable or not, were within the public trust and transferred to the new states upon their entry into the Union. 484 U.S. at 479-81, 108 S.Ct. at 796-97. The State contests the district court's finding that none of the land was subject to the ebb and flow of the tides in 1812. We need not address this factual finding. The State owned all the land at the time it transferred the parcels to Lafourche Realty's ancestors-in-title, either under the equal footing doctrine (described in Phillips Petroleum ) or under the Swamp Land Grant Act, which conveyed "swamp lands subject to overflow" to the State. Whether the State continues to own any ebb-and-flow tidelands is a question of alienability, not acquisition.
 
 
 13
 B. Did the State Transfer Inalienable Public Trust Land?
 
 
 14
 The State transferred title by the issuance of various patents to Lafourche Realty's ancestors-in-title from 1861 to 1901. The State next contends that it could not have legally divested itself of the disputed property, because the property was inalienable public trust land--either tidelands or navigable water bottoms--during the years of the putative transfers of title. The district court resolved this issue by finding that none of the Lafourche Realty property contained navigable waters or was subject to tidal ebb and flow from the Gulf of Mexico from 1812 through 1902--after the last alienation by the State. The district court concluded that the State did not run afoul of any restriction on alienation of public things.
 
 1. The Findings
 
 15
 As with the findings regarding the year 1812, the State challenges the district court's finding that the property contained no tide lands or waters that were navigable or subject to the ebb and flow of the tide until 1902. The trial court found,
 
 
 16
 At no time between 1812 and 1902 was any of the Lafourche Realty Property navigable in fact, capable of sustaining maritime or waterborne commerce, [or] more than at most two or three feet in water depth (and then only in isolated spots), or subject to salt or brackish water intrusion through tidal ebb and flow from the Gulf of Mexico. No evidence was presented of any sustained human habitation or activity including hunting, trapping, or fishing on the property during this period. While small portions of the property, namely, Bays Rambo and Jaque, may have been indirectly and slightly subject to fresh-water tidal influences (as opposed to the direct, open coastal ebb and flow of tides) as early as 1901, none was in 1812. Although the entire area was subject to annual water overflow in and after 1812, this overflow was of fresh water from the Mississippi River; the actual waters of the Gulf did not, and still do not, "spread over" any of the Lafourche Realty Property. Further, this overflow would distribute in an even sheet fashion, and was not channeled along the relict channels that once connected to Bayou Lafourche.
 
 
 17
 ... Lac de l'Isle did not exist before ... 1915.... [A]round 1901 ... Bayou Rambo was no more than a trickling stream; in 1812, Bay Rambo did not cover any of the Lafourche Realty Property.... [I]n 1812, [Bay Jaque] was at most two feet deep at its deepest point. Similarly, Palmetto Bayou and Redfish Bayou ... likely did not exist in 1812.... The relict channels in which Bayou Ferblanc [ ], Bayou Cochon [ ], and Mink Bayou are now located did not contain navigable--if indeed they contained any--water flow as late as 1901.
 
 
 18
 9 R. 2342-43. Again the State simply argues that its evidence was persuasive and attempts to discredit Lafourche Realty's evidence. The trial court heard the evidence, made credibility determinations, and found that none of the land was subject to coastal tidal influence or under navigable waters until after 1901. We will not second-guess the trial court's view of the evidence. The findings of non-navigability and lack of coastal tide waters through 1902 are supported by substantial evidence, including Dr. Gagliano's analysis of the paleogeography of the area.
 
 
 19
 2. No Impermissible Transfer of Navigable Water Bottoms
 
 
 20
 We need not reach the State's argument that navigability of certain waterways at the time of the transfers to private owners rendered the water bottoms inalienable. As noted above, the court found that the property contained no navigable waters until 1902, after the property was alienated to private ownership.
 
 
 21
 We turn next to the State's argument that the land and waters influenced by the tides were inalienable.
 
 
 22
 3. Louisiana's Retained Tidelands: Seashore not Overflow
 
 
 23
 The State also complains that the district court erred in distinguishing between "indirect" fresh-water tidal influences and "direct" coastal ebb and flow from the gulf. The State argues that land overflowed in either manner is inalienable public trust land.
 
 
 24
 Phillips Petroleum teaches that Louisiana law governs the alienability of tidelands. " '[T]here is no universal ... law upon the subject; but ... each State has dealt with the lands under the tide waters within its borders according to its own view of justice and policy.' " Phillips Petroleum, 484 U.S. at 483, 108 S.Ct. at 799 (quoting Shively v. Bowlby, 152 U.S. 1, 26, 14 S.Ct. 548, 557, 38 L.Ed. 331 (1894)). Thus, Louisiana may transfer ownership of tidelands to private parties if permitted by state law.
 
 
 25
 Louisiana has retained some of the tidelands it acquired in public trust as public property. The Civil Code declares that "[p]ublic things" are owned by the State or its political subdivisions and are subject to public use. La.Civ.Code Ann. arts. 450 and 452 (West 1980). The State owns "[p]ublic things ... such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore." Id. art. 450. "Seashore" is defined as "the space of land over which the waters of the sea spread in the highest tide during the winter season." Id. art. 451. Thus, tidelands comprising the seashore or sea bottoms are still owned by the State.
 
 
 26
 Tidelands which Louisiana acquired through the equal footing doctrine that are not seashore or sea bottoms, however, may be privately owned. Inland non-navigable water bodies and swamp land subject to indirect tidal overflow, but not direct coastal ebb and flow, may be privately owned under Louisiana law.[5] Accordingly, we conclude that the district court properly distinguished "direct" coastal ebb and flow from "indirect" freshwater tidal influence. The question narrows to whether any of the subject land is properly characterized as the seashore or any of the water as the sea.
 
 
 27
 The district court found that the entire area comprising the Lafourche Realty property was subject to annual fresh water overflow from the Mississippi River. The court correctly ruled that this characteristic does not render the land inalienable seashore under Louisiana law. As the Louisiana Supreme Court has held,
 
 
 28
 The fact that [land] is subject to tidal overflow does not characterize the land as 'seashore,' under the provisions of the Code.... It has never heretofore been supposed that the definition [of seashore] was intended to include ... any and all land that is subject to tidal overflow, however remote from the 'seashore,' as it is generally understood. The waters of the Gulf of Mexico ... do not 'spread' upon it, during the ordinary high tides, or in the highwater seasons.... These expressions in the Code 'the sea and its shores,' and 'seashore,' have reference to the gulf coast, and to the lakes, bays and sounds along the coast.
 
 
 29
 Buras v. Salinovich, 154 La. 495, 97 So. 748, 750 (1923). That tides may cause other water bodies to rise and spread over the area is insufficient to characterize the land as seashore. See id.; see also State v. Scott, 185 So.2d 877 (La.Ct.App.) (marshland subject to overflow is not seashore), writ denied, 249 La. 485, 187 So.2d 450 (1966).
 
 
 30
 The court found that Bays Rambo and Jaque may have been subject to fresh-water tidal influences as early as 1901, but not direct coastal ebb and flow. Such fresh-water tidal influence, without ebb and flow from the gulf, is not enough to identify the bays as the sea or arms of the sea. Discussing whether the bottom of an inland water body was an arm of the sea and its banks were seashore, the Louisiana Supreme Court analyzed the matter as follows:
 
 
 31
 Bayou Cook appears to form a connecting link between Bay Bastian, an arm of the Gulf of Mexico, and Bay Adam ... situated a mile or more from Bay Bastian, in the interior and in close proximity to the Mississippi river, a few miles above the point of its confluence with the gulf....
 
 
 32
 ... The proof does not show clearly the extent to which the ebb and flow of the tides of the gulf affect those lands on the shores of Bayou Cook.... Evidently the salt water found in Bayou Cook does not result from the overflow occasioned by the high tides flooding its banks; it enters Bay Bastian, in the first instance, and thence passes into Bayou Cook. The salt water thus supplied, combined with the accumulation of fresh water derived from the Mississippi river, floods the banks of Bayou Cook and passes into the adjacent marsh, to be returned again to the gulf, when the tide is low.
 
 
 33
 Morgan v. Negodich, 3 So. 636, 639 (La.1887). The court concluded that Bayou Cook was not an arm of the sea and its banks formed no part of the seashore, because the "the waters of the sea (gulf)" did not "spread over" its banks. Id. at 639. Hence, inland waters, such as Bays Jaque and Rambo are not arms of the sea even if their banks were subject to fresh water tidal overflow. See also Buras, 97 So. at 750 (holding that "the sea" means water bodies along the gulf coast).
 
 
 34
 Upon finding that none of the Lafourche Realty property constituted the "bottoms of natural navigable water bodies ... [or] the seashore," the district court concluded that the State did not run afoul of any restriction on alienation of public things. This conclusion was correct. At the time of the issuance of patents, the property consisted of only inland non-navigable water bodies and swamp land subject to overflow--neither of which is inalienable public property under the Code.
 
 C. Subsequent Navigability or Tides
 
 35
 The State also assigns for review the question whether "waters which are today saline, subject to ebb and flow of the tide, and de facto used in commercial navigation" are State owned. The State brief suggests only that navigable water bodies are "now" considered public things under the 1978 revisions of the Civil Code and that the State owns lands influenced by the tides to "today's high water mark" under Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877. Questions posed for appellate review but inadequately briefed are considered abandoned. See Friou v. Phillips Petroleum Co., 948 F.2d 972, 974 (5th Cir.1991); Harris v. Plastics Mfg. Co., 617 F.2d 438, 440 (5th Cir.1980).
 
 
 36
 We note, nevertheless, that the district court properly focussed its inquiry regarding ownership and riparian rights upon the status of the waterways in 1812. E.g., Ramsey River, 396 So.2d at 875 ("[N]avigability to fix ownership of the river bed is determined by the year of admission to statehood."); State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145, 153 (1935) (navigability and high water mark of 1812 determine title questions), cert. denied, 297 U.S. 716, 56 S.Ct. 591, 80 L.Ed. 1001 (1936). As for the effect of the tide today, sympathetic tidal influence in inland waterways does not make the waterways "sea" or their banks "seashore." See Buras, 97 So. at 750; Morgan, 3 So. at 639. Under the court's findings, the land is still not sea bottom or seashore, and so cannot become public property as such.
 
 II. CLAIM FOR A RIGHT OF USE OR ACCESS
 
 37
 We next consider the State's and the private Plaintiffs' right-of-use claims. The Appellants assert a navigational servitude over the water bodies under federal or state law.
 
 A. Federal Navigational Servitude
 
 38
 Appellants argue first that the navigable streams in this case are subject to a federal navigational servitude which gives the public unrestricted access. The navigational servitude arises by virtue of the Commerce Clause in some navigable waters. Kaiser Aetna v. United States, 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979), made it clear, however, that the navigational servitude does not extend to all navigable waters. Id. at 172-73, 100 S.Ct. at 388-89. When a navigational servitude exists, it gives rise to the right of the public to use those waterways as "continuous highways for the purpose of navigation in interstate commerce." Id. at 178, 100 S.Ct. at 392.
 
 
 39
 In Kaiser Aetna, the Court was concerned with the public's right of access to Kuapa Pond, a large lagoon contiguous to a navigable bay but separated from that bay by a barrier beach. Kuapa Pond was two feet deep and had been considered private property under Hawaiian law. Kaiser Aetna developed a marina around the pond. In developing the marina, Kaiser Aetna dredged Kuapa Pond to a depth of six feet, dredged an eight-foot-deep channel through the barrier beach into the nearby bay, and increased the clearance of an overhead bridge to allow boats to pass from the marina to the bay. Kaiser Aetna then allowed access to the pond only to those who paid a fee.
 
 
 40
 The Army Corps of Engineers, which had earlier consented to the improvement, declared the pond to be navigable water of the United States and demanded that Kaiser Aetna allow the public free access to the pond. The district court concluded that imposition of free public access to Kuapa Pond would be a taking of private property for which just compensation must be paid. United States v. Kaiser Aetna, 408 F.Supp. 42, 54 (D.Haw.1976). The Court of Appeals reversed, United States v. Kaiser Aetna, 584 F.2d 378 (9th Cir.1978), holding that, as a navigable water of the United States, Kuapa Pond was subject to a public right of use. The Supreme Court reversed. 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).
 
 
 41
 The majority reasoned that not all navigable waters are subject to a navigational servitude, and unless a navigational servitude is imposed on a waterway, the public has no right to use it. A navigational servitude recognizes "the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation." Kaiser Aetna, 444 U.S. at 175, 100 S.Ct. at 390. The Court identified several factors that convinced it that no navigational servitude was imposed on Kuapa Pond: 1) Kuapa Pond in its natural state could not have been navigated and was not comparable to the major natural bodies of water to which the servitude had earlier been applied; 2) the pond was private property under Hawaiian law; 3) the pond had been converted to a navigable body of water by the petitioners through the investment of private funds; and 4) the Corps had earlier consented to the conversion. Id. at 178-79; see generally The Supreme Court, 1979 Term, 94 Harv.L.Rev. 75, 105-14 (1980) (discussing Kaiser Aetna's multi-factor approach).[6]
 
 
 42
 In a companion case, Vaughn v. Vermilion Corp., 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979), the Court considered whether the public was entitled to access to a canal dredged on private property with private funds. The Supreme Court, relying on Kaiser Aetna, held that to the extent the artificial canal had not displaced natural waterways, the public had no right of access to it.
 
 
 43
 Applying Kaiser Aetna and Vaughn to the facts of today's case, we conclude that Plaintiffs have no right of access to Tidewater Canal. That canal was dredged on private property with private funds. The district court specifically found that the construction of the canal did not interfere with or obstruct preexisting navigable waterways. Plaintiffs have not shown that this finding was clearly erroneous.
 
 
 44
 Unfortunately, the record in this case does not permit us to determine whether the other navigable bodies at issue in this case are subject to a navigational servitude. One of the factors enumerated by the court in Kaiser Aetna is clear: we are satisfied that under Louisiana law the water bodies, all of which were non-navigable or nonexistent in 1812 or even as late as 1902, were private property. The other factors, however, are not so clear.
 
 
 45
 First, it is not plain to us whether the remaining navigable water bodies at issue are navigable in their "natural state." The district court found that some of the other water bodies became navigable from the increased water flow of Tidewater Canal. In 1948, the Tidewater Canal was dug from near Bayou Lafourche northeasterly. The trial court found that
 
 
 46
 when dug, its path intersected no identifiable continuous waterway, whether navigable or otherwise. Thereafter, the canal was further extended, drill slips and further canals were dug, and preexisting waterways were deepened and widened--all with the approval of the U.S. Army Corps of Engineers and all on private property. Together, these interconnecting waterways made it possible for large oil rigs and barges to be brought into the area from Bayou Lafourche to the west or from Caminada Bay (and ultimately the Gulf of Mexico) to the southeast.
 
 
 47
 The wide interconnections have increased the channelized water flow, which has promoted scouring of the waterways. Further, these interconnections have allowed salt water from the bays to the south and east to permeate all the waterways in the area. The salt water in turn has caused the fresh water vegetation, which had helped prevent erosion, to die and thus has led to further accelerated loss of land surface. Wave wash from passing vessels has contributed significantly to this erosion as well.
 
 
 48
 9 R.2319. The court thus found that their banks and beds were gradually eroded and scoured from the effects of increased water flow, salt water intrusion, and wave wash.[7] The district court did not consider whether waterways that become navigable through such a process are considered interstate navigable waters in their "natural" condition. We are persuaded that waterways made navigable through erosion are "naturally" navigable even though the erosion is caused by increased water flow from a connecting dredged canal. See O'Brien v. State Mineral Bd., 209 La. 266, 24 So.2d 470, 473 (1945) (considering erosion or subsidence from wind, wave, and current "natural forces").
 
 
 49
 The district court found that the landowner dredged other canals and deepened and widened some preexisting water bodies. The court made no findings on the timing or extent of that dredging, except that Bayou Ferblanc was dredged in the 1950s to make a pirogue trail.
 
 
 50
 On remand, if the district court finds that the landowner's dredging activity on any of these waterways initially rendered that body navigable, then we would reach the same conclusion with respect to that water body as we do with Tidewater Canal. However, if such dredging activity did not initially render the water body navigable, the court should make additional findings and conclusions. As to each of the waterways at issue, the district court should make findings on the factors the Court considered important in Kaiser Aetna and determine whether a navigational servitude is imposed.
 
 
 51
 In sum, a navigational servitude is ordinarily imposed on a naturally navigable waterway. To negate the existence of a navigable servitude on a naturally navigable waterway, the landowner must demonstrate through the factors discussed in Kaiser Aetna that its interests outweigh those of the public.
 
 B. No State Servitude
 
 52
 Appellants claim entitlement under Louisiana law to use the waterways on the Lafourche Realty property as "public things" either because they are navigable now or because they contain "running waters." Appellants argue that Chaney v. State Mineral Board, 444 So.2d 105 (La.1983), identifies a public right of use of non-tidal, non-navigable bodies of water. We think the district court correctly distinguished Chaney, a possessory action in which riparian landowners along a non-navigable stream were trying to establish the extent of their possession. Such arguments have failed to carry the day in Louisiana courts. E.g., Amigo Enters., Inc. v. Gonzales, 581 So.2d 1082, 1084 (La.Ct.App.1991); Brown v. Rougon, 552 So.2d 1052, 1058-60 (La.Ct.App.1989), writ denied, 559 So.2d 121 (La.1990).
 
 
 53
 Finally, Appellants rely on the Civil Code articles pertaining to alluvion, dereliction, and abandoned river beds as providing a servitude. Article 499 grants to the riparian owner any accretion formed on a river bank or dereliction formed by water receding from a bank; article 504 provides for ownership of an abandoned river bed upon a change in the river's course. None of the circumstances contemplated by these articles occurred here, so these articles have no application.
 
 III. PLAINTIFFS' OTHER EXPERT
 
 54
 Plaintiffs also assert error in the district court's failure to mention in its rulings the opinion of Professor James D. Gosselink. The trial court expressed in both opinions that it gave considerable weight to the testimony of Dr. Gagliano. 9 R. 2324, 2342. We do not require a district court to mention each witness by name in reciting its findings.
 
 IV. BIFURCATION
 
 55
 The district court ordered that the title dispute and the claims to a navigational servitude be separately tried under Federal Rule 42(b). Appellants assert that bifurcation of the title issue from the navigational servitude issue prejudiced them. We find no prejudice in the bifurcation of the trial and no abuse of discretion in the order for separate trials. See United States v. 499.472 Acres of Land, 701 F.2d 545, 549-51 (5th Cir.1983).
 
 V. CONCLUSION
 
 56
 The district court's careful, considered opinion on title rested on findings of fact amply supported by the record. The record ownership of Lafourche Realty Company was properly sustained. Appellants also failed to demonstrate any reversible error in the findings and conclusions that Lafourche Realty's title is unburdened by any state servitude. No federal navigational servitude exists on the Tidewater Canal. The judgment of the district court in all of these respects is affirmed. Consistent with our earlier discussion, we remand the case for further consideration (following an additional hearing, if the district court thinks it necessary) of whether a federal navigational servitude encumbers other waterways.
 
 
 57
 AFFIRMED IN PART; VACATED IN PART and REMANDED.
 
 
 
 [1]
 Senior Circuit Judge of the Eleventh Circuit, sitting by designation
 
 
 [2]
 The district court found that in 1812,
 [None] of the Lafourche Realty Property [was] navigable in fact, capable of sustaining maritime or waterborne commerce, [or] more than at most two or three feet in water depth (and then only in isolated spots).... No evidence was presented of any sustained human habitation or activity including hunting, trapping, or fishing on the property....
 ... Lac de l'Isle did not exist.... Bay Rambo did not cover any of the Lafourche Realty Property.... [Bay Jaque] was at most two feet deep at its deepest point. Similarly, Palmetto Bayou and Redfish Bayou ... likely did not exist.... The relict channels in which Bayou Ferblanc [ ], Bayou Cochon [ ], and Mink Bayou are now located did not contain navigable--if indeed they contained any--water flow as late as 1901.
 
 
 [9]
 R. 2342-43
 
 
 [3]
 The Hughes map generally characterized the property in the vicinity of Lafourche Realty holdings as marsh, and the Hughes field notes confirmed that the land was characterized by ridges with marshy land between, "possibly ... formed by the deposits from branch bayous which in the course of time [have] been nearly filled up, but traces of them are still to be seen." 22 R.72-73; L.R. Ex. 44 at 15-16. Dr. Gagliano noted that Captain Hughes's field notes made no reference to any flowing channels in the area. 22 R. 73
 
 
 [4]
 The State is concerned that the trial court exacted a more stringent test of navigability and argues that Ramsey River required only that the river be capable of supporting lumbering operations through floating lumber. We disagree with this reading of the case. Ramsey River relied on more than a simple log-floating test of navigability: the court also inferred that the disputed section of the river was not substantially different from a navigable downriver location. 396 So.2d at 876-77. A short distance downstream, the same water body was twenty feet wide in low water and supported a forty-five ton, ninety-foot long, fourteen-foot wide steamer drawing four feet of water
 
 
 [5]
 See Sinclair Oil & Gas Co. v. Delacroix Corp., 285 So.2d 845, 852-53 (La.Ct.App.1973) (nonnavigable waters with evidence of tidal flow); Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249, 251 (1906) (non-navigable grass-filled lagoon influenced by ebb and flow from Lake Pontchartrain); see also A. Yiannopoulos, 2 Louisiana Civil Law Treatise § 73 at 144 (3rd ed. 1991)
 The Louisiana legislature has recently confirmed that the State may alienate inland non-navigable water bottoms:
 Any act by which the state has transferred ... ownership of immovable property which, at the time of the transfer, encompasses inland non-navigable water beds or bottoms within the boundaries of the property transferred, is presumed to convey to the transferee the ownership of the inland non-navigable water bottoms, unless title thereto has been expressly reserved by the state of Louisiana in the act.
 La.Rev.Stat.Ann. § 9:1115.3 (West Supp.1993). "Inland non-navigable water bodies" are defined as "those which are not navigable in fact and are not sea, arms of the sea, or seashore." Id. § 1115.2 A. This legislation was intended "to codify and confirm the law of Louisiana ... without change." Id. § 1115.1 C. See also Lawrence E. Donohoe, Jr., & Patrick G. Tracy, Jr., Phillips Petroleum Co. v. Mississippi: The Louisiana State Law Institute's Advisory Opinion Relative to Non-Navigable Waterbottoms, 53 La.L.Rev. 35, 63 (1992) ("[A]ny limitation upon private ownership of [non-navigable water bottoms affected by the ebb and flow of the Gulf tide] must be found within the context of the codal classification for the territorial sea and seashore.").
 
 
 [6]
 Because of the Army Corps of Engineers' intervention to enforce the right of public access in Kaiser Aetna, the Court considered the additional issue of whether the Corps had effected a taking for which compensation was due. No federal agency seeks to limit Lafourche Realty's ownership rights in this case, so we have no "takings" issue presented
 
 
 [7]
 Although the district court found that none of the waterways would have become navigable "absent extensive human intervention," apparently that "intervention" was the dredging of Tidewater Canal. For example, Lac de l'Isle became navigable after the Tidewater Canal cut across its north end, which increased the water flow into the lake. Similarly, Mink Bayou was not navigable until 1948, when the Tidewater Canal intersected it