REVISED OCTOBER 25, 2011

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals
Fifth Circuit**

**F I L E D**

October 19, 2011

Lyle W. Cayce
Clerk

No. 10-30092

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERTO ZAMORA AND FLETCHER FREEMAN, JR.,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge, and STEWART and SOUTHWICK, Circuit Judges.
CARL E. STEWART, Circuit Judge:

Roberto Zamora and Fletcher Freeman, Jr. appeal from their conviction related to drug trafficking. A jury found both Zamora and Freeman guilty of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846; found Zamora guilty of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1); and found Freeman guilty of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). Zamora and Freeman separately raise a number of challenges to their convictions. We AFFIRM.

I.

A.    The Chapa-Duran Conspiracy

From 2002 until 2006, the government alleges, the Chapa-Duran drug trafficking conspiracy was responsible for transporting drugs by car from Mexico into Houston, Texas, and, by means of a route through Louisiana, into Columbus, Georgia.  Francisco Chapa-Duran, a Mexican fugitive, led the conspiracy.

In Mexico, Chapa-Duran and his associates would hide the drugs in vehicles used for trafficking operations.  Participants in the conspiracy would receive several thousands of dollars to drive drugs into the United States, with the amount of money generally determined by the length of the trip and the duration of their service to the organization.  When drugs were transported to Georgia, the means of delivery to local dealers varied, but when drugs were transported to Houston, the vehicle would normally be left in the Galleria Mall parking lot, where a local dealer would retrieve the drugs from the car.

A distinguishing feature of the Chapa-Duran conspiracy was the way  in which it used vehicles.  In an attempt to prevent detection by law enforcement, members of the conspiracy would modify the dashboards and battery compartments of automobiles to outfit them for the storage of drugs.  The vehicles of choice for the Chapa-Duran conspiracy were Volkswagen Beetles, the dashboards of which could be easily modified for drug storage, and Toyota Camrys, the battery compartments of which were similarly adaptable.  Often, the conspiracy would register vehicles under the names of non-participants in the conspiracy so that these vehicles would not be traced back to Chapa-Duran.

Many of the individuals involved in this conspiracy have pleaded guilty to drug trafficking crimes and have been sentenced to jail time for their role.  The

government alleges that both Fletcher Freeman, Jr., and Roberto Zamora were participants in the Chapa-Duran conspiracy.

B.    Fletcher Freeman, Jr.

Freeman, who was employed in the trucking business, lived in Columbus, Georgia.  The government alleges that couriers working for the Chapa-Duran conspiracy transported drugs to him and Bruce Stinson, a member of the conspiracy who had pleaded guilty to charges related to drug trafficking prior to the trial of Zamora and Freeman.  During trial, a number of government witnesses, most of them participants in the Chapa-Duran conspiracy, testified that Freeman was the recipient of drugs brought by the Chapa-Duran conspiracy from Mexico.  One witness, a member of the Chapa-Duran conspiracy, testified that he transported drugs to Freeman's house and counted money there.  Two other witnesses, also members of the Chapa-Duran conspiracy, testified to having turned drugs over to Freeman in exchange for money.  Another witness who was not involved in the conspiracy testified that Freeman paid him to tow a vehicle containing drugs to Georgia.  The evidence presented by the government portrayed Freeman as a central figure in the Georgia branch of the Chapa-Duran conspiracy.

C.    Roberto Zamora

Roberto Zamora was arrested in Houston on April 4, 2006.  That morning, at approximately 9:40 a.m., police began to monitor Zamora's residence, 2118 Fulton Street, after receiving a tip from a confidential informant that drugs might be located on the premises.  The police determined the tip was reliable because the informant who provided the tip previously had provided the police with reliable information and certain aspects of the informant's tip had been corroborated.  As the informant had described, the police found a garage area on the south side of the residence with a black tarp covering the carport, and a gate in front of the house.  Also as described, police found three cars outside when

they arrived: a blue Volkswagen ("the Volkswagen"), a black Camaro, and a black pickup truck. While the police were observing the residence that morning, a red Lincoln Navigator ("the Navigator") arrived at 2118 Fulton Street. Police later learned that Roberto Zamora and his brother, Leobardo Zamora, were the driver and passenger of the Navigator. An officer testified during trial that he watched Leobardo enter the residence wearing one shirt and leave wearing another, and observed Roberto Zamora enter the Volkswagen and then exit it. Further testimony came from officers who witnessed Roberto Zamora parking the Volkswagen behind the black tarp covering the carport, as if Zamora wanted to conceal what was happening in the carport.

After their brief stop at the residence, Roberto and Leobardo Zamora left 2118 Fulton Street in the Navigator at 11:09 a.m. A couple minutes later, officers for the Houston Police Department stopped the Navigator for both a traffic violation and as part of their investigation of drug-related crimes at 2118 Fulton Street. After conducting a search for warrants, officers learned that Leobardo had one warrant outstanding and Roberto had none. The police then called in a drug-sniffing dog. At approximately 11:45 a.m., the dog alerted to the Navigator, leading the police to search the car for drugs. Their search did not turn up any drugs. Following the search, officers continued to speak with Zamora. At 11:58 a.m., Zamora signed a form consenting to a search of 2118 Fulton Street.

Within the next thirty minutes, police drove to 2118 Fulton Street and found contraband: a package of cocaine weighing .7 grams, a money counter, a "perceived drug ledger," packing materials commonly used for trafficking cocaine, marijuana, and a firearm. A drug-sniffing dog also alerted to the Volkswagen, leading the police to execute a search warrant for the car and find four kilograms of cocaine in the Volkswagen. Like the Volkswagens used by the Chapa-Duran conspiracy, the dashboard of the Volkswagen on the premises of

2118 Fulton Street was modified for the convenient transportation of cocaine. Additionally, police later learned that the Volkswagen at 2118 Fulton Street had previously been used by members of the Chapa-Duran conspiracy.

Several hours after the police arrived at 2118 Fulton Street, Roberto Zamora told the police that he knew about the drugs in the Volkswagen but his brother did not. He also told the police that a gun was located in a bedroom in the 2118 Fulton Street residence underneath a bed. At that point, officers recited Miranda warnings to Zamora for the first time. Zamora promptly stopped speaking with them.

D.    Suppression Hearing, Trial, and Sentencing

On March 11, 2009, both Roberto Zamora and Freeman were charged in a superseding indictment with conspiracy to possess with intent to distribute cocaine and other controlled substances. Additionally, Zamora was charged with possession of a firearm in furtherance of a drug trafficking crime, and Freeman was charged with possession with intent to distribute cocaine.[1]

During pretrial proceedings, Roberto Zamora moved to suppress all evidence obtained from the officers' search of the premises at 2118 Fulton Street. Initially, the district court suppressed the firearm found in Zamora's residence on the grounds that Zamora had not been read his Miranda rights when he made the statement that led police to find the firearm. On the government's motion for rehearing, however, the district court ruled that the gun was admissible because the government would have inevitably found the gun even in the absence of Zamora's statement. The court again ruled that Zamora's statement relating to the gun must be suppressed.

---

[1] The indictment also charged Leobardo Zamora, but his indictment is not the subject of this proceeding. Subsequent discussions of "Zamora" in this opinion will refer to Roberto Zamora.

The trial lasted four days. Forty-one witnesses testified for the government, mostly law enforcement and members of the Chapa-Duran organization. In addition to the evidence related to the traffic stop of Zamora, the deliveries of drugs to Freeman, and the general workings of the Chapa-Duran organization, the government presented evidence that it argued connected Zamora to the Chapa-Duran conspiracy. For example, the government introduced into evidence a notebook that, according to expert testimony, was consistent with use as a drug ledger and contained Zamora's fingerprints. This ledger contained the name "Gordo," a nickname that, according to witness testimony, was also used by a Houston-based customer of the Chapa-Duran organization. Further, the government showed that the Volkswagen found outside Zamora's residence had been previously used for drug trafficking purposes by members of the Chapa-Duran organization. One witness for the defendants also testified.

During the trial, Freeman's lawyer cross-examined James Thomas, the officer who served as case agent for the investigation of the Chapa-Duran organization. Thomas mentioned that Freeman had "a criminal history" in the following exchange:

> Q: Is it a fact that other authorities in Georgia investigated Mr. Freeman and rejected charges on him?
> A: I don't know. He's got – he's got a criminal history other than what he's been arrested for here. That's all I know.
> Q: He's never been convicted of anything, correct?
> A: Not that I know of, no, sir.

At the close of the government's evidence, both Freeman and Zamora moved for a judgment of acquittal on the grounds of insufficiency of the evidence. Both motions were denied. The jury found the defendants guilty on all counts. Zamora received the mandatory minimum of 120 months on the conspiracy conviction and 60 months on the firearm conviction, running consecutively.

Freeman received a sentence of 210 months for each conviction, running concurrently.

Their timely appeals followed.

## II.

Zamora and Freeman raise a number of challenges to their convictions. We consider each in turn.

## A.

Zamora argued in his brief that the district court erred by concluding that he was not entitled to consideration for a downward adjustment of his sentence under U.S.S.G. § 3B1.2. During oral argument, however, Zamora's attorney conceded that the issue had become moot when the district court sentenced him to the mandatory minimum. Accordingly, we will not consider this contention. See United States v. Mankins, 135 F.3d 946, 950 (5th Cir. 1998).

## B.

Zamora also challenges the district court's decision to admit evidence found at 2118 Fulton Street. He argues that the district court should not have admitted the evidence because it was the fruit of an unconstitutional traffic stop.

We analyze a traffic stop's constitutionality under a two-part framework. We first review "whether or not the officer's decision to stop the vehicle was justified at its inception." United States v. Pack, 612 F.3d 341, 350 (5th Cir. 2010) (citation omitted), modified on other grounds on denial of reh'g, 622 F.3d 383. Traffic stops are justified at their inception when they are supported by "a reasonable and articulable suspicion that a person has committed a crime." United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006) (quoting United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002)). Reasonable suspicion may be "based on information provided by a confidential informant, if the information possesses 'an indicia of reliability.'" United States v. Roch, 5 F.3d 894, 898 (5th

Cir. 1993) (citation omitted). We consider a number of factors when deciding whether a tip provides reasonable suspicion for an investigative stop, including:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

United States v. Martinez, 486 F.3d 855, 861 (5th Cir. 2008) (quotation and citations omitted). If the stop was justified at its inception, our second step is to "determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." Pack, 612 F.3d at 350 (citation omitted). When an officer makes a stop based on reasonable suspicion, the detention of a suspect may "last no longer than required to effect the purpose of the stop." Jenson, 462 F.3d at 404 (citation omitted).

The officers had two justifications for their initial stop of Zamora. First, the Navigator had a cancelled rear license plate and a missing front license plate. Evident traffic violations such as these clearly provide the police with reasonable suspicion to stop the vehicle. Pack, 612 F.3d at 350 (citation omitted). Second, reasonable suspicion of drug trafficking arose from the informant's tip and the officers' monitoring of 2118 Fulton Street, combined with their reasonable belief that the Zamoras lived at the property located at 2118 Fulton Street. Here, the tip that drugs might be located at 2118 Fulton Street provided the officers with reasonable suspicion justifying the stop of the car because the tip had several "indicia of reliability." The officers had previously known the confidential informant to be reliable. See Gonzalez, 190 F.3d at 672-73. Officers had also corroborated several aspects of the informant's tip through their observation of the residence. See United States v. Tijerina, 272 F. App'x

8

378, 380 (5th Cir. 2008) (per curiam). The tip had been received on the morning when the police began their investigation and so was not stale. See Gonzalez, 190 F.3d at 673. Additionally, the officers had good reason to connect Roberto and Leobardo Zamora to the 2118 Fulton Street residence. Both men had driven in the Navigator to 2118 Fulton Street, and Roberto had unlocked the gate. They had also both engaged in suspicious behavior while outside the residence at 2118 Fulton Street, including an apparent attempt to hide their conduct from public view. For these reasons, the combination of this tip and the monitoring of 2118 Fulton Street provided reasonable suspicion of drug trafficking activities carried on by the occupants of the Navigator. Thus, the police had two independent justifications for their stop: their reasonable suspicion of traffic violations and their reasonable suspicion of drug trafficking.

The next step is to consider whether the actions taken by the police subsequent to the initial detention were reasonably related in scope to the original detention. After the police interrogated both Zamora brothers about their license plate violations and performed a computer check on their license plates, the traffic violation no longer provided a sufficient rationale for detaining Roberto Zamora. Jenson, 462 F.3d at 404. Nevertheless, the reasonable suspicion for the drug-related offense remained, justifying the officers' decision to call for drug-sniffing dogs. See United States v. Williams, 69 F.3d 27, 28 (5th Cir. 1995). Once the drug-sniffing dog alerted to the scent of narcotics, the police had probable cause that drugs were in the Navigator and therefore were authorized to search the vehicle. See United States v. Garcia, 319 F.3d 726, 730 (5th Cir. 2003). The search of the Navigator did not turn up drugs. Even so, the short detention of Zamora for the purpose of continued questioning between 11:45 a.m., the approximate time the drug-sniffing dogs concluded their search,

and 11:58 a.m., the time Zamora signed the consent form,[2] was not unreasonable. The original purpose of the officers' stop was to interrogate Roberto and Leobardo Zamora about drug trafficking that seemed to be occurring at 2118 Fulton Street, not in the Navigator. Therefore, despite the absence of drugs in the Navigator, the short period of additional questioning was reasonably related to the purpose of the officers' detention.

Because the officers' conduct was not unreasonable, the officers did not violate Zamora's Fourth Amendment rights and the challenged evidence was not the fruit of a constitutional violation. The district court did not err when it admitted the evidence found at 2118 Fulton Street.

C.

Zamora next challenges the district court's failure to provide the venue instruction that he requested. Zamora asked that the district court instruct the jury that the government needs to prove venue in the Western District of Louisiana, where the trial was held. Zamora contends that the district court's failure to do so requires acquittal.

We review a district court's refusal to provide a jury instruction requested by the defendant for abuse of discretion. United States v. Wright, 634 F.3d 770, 775 (5th Cir. 2011). "We will reverse the district court's decision only if the requested instruction (1) was a substantially correct statement of the law; (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." Id. (quotation marks and citation omitted). The "failure to instruct on venue is reversible error when trial testimony puts venue in issue and the defendant

---

[2] Because Zamora does not contend that his consent was involuntary, we do not address this issue. See United States v. Valdiosera, 932 F.2d 1093, 1099 (5th Cir. 1991) (stating that "any issue not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal").

requests the instruction . . . ." United States v. White, 611 F.2d 531, 536 (5th Cir. 1980) (citation omitted). Venue is not put "in issue" when the government presents adequate evidence of venue, and the defendant fails to contradict the government's evidence. United States v. Caldwell, 16 F.3d 623, 625 (5th Cir. 1994). If venue is not put at issue, the district court's failure to instruct on venue is, at worst, harmless error. Id.

We reject Zamora's argument. The government is permitted to try defendants accused of conspiracy in any district where an overt act in the conspiracy took place. Id. at 624. Here, the government presented evidence showing that overt acts in the Chapa-Duran conspiracy occurred in the Western District of Louisiana. While Zamora argued during trial that he was not part of the Chapa-Duran conspiracy, Zamora never contradicted the government's contention that overt acts of the Chapa-Duran conspiracy occurred in the Western District of Louisiana. Without any evidence to the contrary, there was no dispute as to whether the Western District of Louisiana was an appropriate venue to try alleged members of the Chapa-Duran conspiracy. Therefore, venue was not put "in issue." See id. at 624. For this reason, the district court did not commit reversible error when it denied Zamora's proposed venue instruction.

D.

Zamora also contends that the district court erred by denying his motion for judgment of acquittal. Zamora argues that the evidence presented by the government demonstrated neither that he was part of the Chapa-Duran conspiracy nor that he used a gun in furtherance of a drug trafficking offense.

We review a district court's denial of a motion for judgment of acquittal de novo. United States v. Xu, 599 F.3d 452, 453 (5th Cir. 2010). The analysis focuses on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

(1979). This requires the defendant to make a "high showing." United States v. Fernandez, 559 F.3d 303, 315 (5th Cir. 2009). It is not the province of the appellate court to "evaluate the weight of the evidence or the credibility of the witnesses." United States v. Solis, 299 F.3d 420, 445 (5th Cir. 2002) (citation omitted). Accordingly, "'[j]urors are free to choose among reasonable constructions of the evidence' in order to arrive at a verdict." United States v. Thomas, 627 F.3d 146, 151 (5th Cir. 2010) (citation omitted).

1.

We first consider Zamora's motion for a judgment of acquittal on the charge of conspiracy to possess with intent to distribute cocaine. To show that a defendant was part of a conspiracy to distribute cocaine, the government must prove "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." United States v. Booker, 334 F.3d 406, 409 (5th Cir. 2003) (citation omitted). A jury may "infer the existence of an agreement [to a conspiracy] from . . . testimony and the other circumstantial evidence." United States v. Garcia, 567 F.3d 721, 732 (5th Cir. 2009). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." United States v. Lewis, 476 F.3d 369, 383 (5th Cir. 2007) (quotation marks and citation omitted). If all that is proven, however, is a "defendant's mere presence at the crime scene or close association with conspirators, jurors would not be entitled to infer participation in the conspiracy." United States v. Diaz, 637 F.3d 592, 602 (5th Cir. 2011) (quotation marks and citation omitted).

It is not seriously contested that Francisco Chapa-Duran operated a conspiracy to traffic drugs, or that many of the witnesses at trial were part of that conspiracy. Zamora contends, however, that he did not know of the Chapa-Duran conspiracy or voluntarily participate in it. Viewed in the light most

favorable to the jury's verdict, the evidence that Zamora knew of and participated in the Chapa-Duran conspiracy to distribute cocaine was sufficient to convict Zamora.

The government presented two items of evidence that, when considered together, permit a rational trier of fact to infer that Zamora knew of and participated in the Chapa-Duran conspiracy. First, the Volkswagen used by Zamora had previously been titled to two members of the Chapa-Duran drug trafficking organization. Like the Volkswagen used by the Chapa-Duran organization, Zamora's Volkswagen was modified in a way that facilitated the transportation of illegal drugs. Further, evidence showed that it was common for the members of the Chapa-Duran organization to transfer cars used for drug trafficking among themselves. When officers observed it on April 4, 2006, the Volkswagen contained cocaine and was parked outside of the house Zamora lived in. Zamora told police that he knew about the cocaine contained in the Volkswagen. Thus, the jury heard evidence that Zamora's Volkswagen had previously belonged to members of the Chapa-Duran organization, was outfitted in the same way as the Volkswagen used by the Chapa-Duran organization, and was used for the purpose as the Chapa-Duran Volkswagen. This type of "concert of action can indicate agreement and voluntary participation" in a conspiracy. See United States v. Lopez, 979 F.2d 1024, 1029 (5th Cir. 1992).

Second, the drug ledger found by police also allowed a rational juror to infer that Zamora knew of and participated in the Chapa-Duran conspiracy. According to expert testimony, the notebook found by police in Zamora's residence contained Roberto Zamora's fingerprints and indicia of being used to record illicit drug transactions. This ledger also contained the name "Gordo." Trial testimony established that a man named Gordo was among the persons in Houston who purchased drugs from the Chapa-Duran organization. The presence of a known customer of the Chapa-Duran conspiracy in a drug ledger

containing Roberto Zamora's fingerprints supports the inference that Roberto Zamora was involved in drug trafficking with the Chapa-Duran organization. See United States v. Jones, 347 F. App'x 129, 136 (5th Cir. 2009).

While both of these items of evidence are circumstantial, they are, when taken together, strong enough that the jury was permitted to infer that Zamora knew of the Chapa-Duran conspiracy and participated in it. The district court did not err when it denied Zamora's motion for a judgment of acquittal for conspiracy to possess with intent to distribute cocaine.

2.

Zamora further contends that the evidence did not establish that the firearm found in his residence was possessed in furtherance of a drug trafficking crime. This offense is committed when "during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . " 18 U.S.C. § 924(c)(1)(A). We have looked to several factors in determining whether a gun was used in furtherance of a drug trafficking offense: "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000).

Viewed in the light most favorable to the jury's verdict, the evidence also supports the conclusion that Zamora possessed a weapon in furtherance of a drug trafficking crime. First, the gun was found in Zamora's residence at 2118 Fulton Street, which supports the jury's conclusion that Zamora "possessed" the firearm. Second, the jury could conclude that the combination of the four kilograms of drugs found in the Volkswagen outside the residence and the drug-

related paraphernalia found inside the residence showed that drug trafficking was occurring at 2118 Fulton Street. Cf. United States v. Rose, 587 F.3d 695, 702 (5th Cir. 2009) (holding that large amount of cocaine packaged in individual baggies was one basis for affirming conviction for possession of a firearm in furtherance of a drug trafficking offense). Third, several facts of this case support the conclusion that Zamora possessed the gun "in furtherance" of drug trafficking. The gun was loaded, see id. at 703; it was easily accessible underneath a bed, cf. id; and it was a handgun, a type of gun commonly used in drug trafficking, see id. at 702. Further, a rational juror could conclude that the gun was located near the location of activity related to drug trafficking: while most of the drugs found were in the Volkswagen, a number of the accoutrements of the drug trade–including the drug ledger and measuring materials–were located near the gun.

For all these reasons, a rational juror could have concluded that the gun found at 2118 Fulton Street was used in furtherance of drug trafficking. The district court's denial of Zamora's motion for a judgment of acquittal on his conviction for possessing a firearm in furtherance of a drug trafficking offense was not erroneous.

E.

Freeman argues that the district court erroneously denied his motion for a mistrial. Freeman maintains that a witness's testimony that Freeman had "a criminal history" was so prejudicial that it requires a mistrial.

We review a denial of a motion for mistrial for abuse of discretion. United States v. Mitchell, 484 F.3d 762, 775 (5th Cir. 2007). If a defendant moves for a mistrial on the grounds that the jury heard prejudicial testimony, "a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record." United States v. Paul, 142 F.3d 836, 844 (5th Cir. 1998) (citation

omitted). If the "evidence is so prejudicial that the jury will unlikely be able to erase it from their minds, then a mistrial should be ordered." United States v. Escamilla, 666 F.2d 126, 128 (5th Cir. 1982) (citations omitted). To determine whether prejudicial testimony should prompt a mistrial, we have focused on the characteristics of the prejudicial evidence, see Paul, 143 F.3d at 844, and the strength of the other evidence in the case, see United States v. Limones, 8 F.3d 1004, 1007 (5th Cir. 1993); United States v. Millsaps, 157 F.3d 989, 993 (5th Cir. 1998).

Our review of the record demonstrates that the district court did not err when it denied Freeman's motion for a mistrial. First, the inadmissible testimony was isolated, only vaguely related to the alleged crime, and its prejudicial impact was limited by subsequent events.[3] The inadmissible testimony was only vaguely related to the charges brought by the government in that it did not establish any specific conduct by Freeman. Instead, it only established that Freeman had "a criminal history." The testimony was isolated because the jury never heard anything of this criminal history after the witness mentioned it. Paul, 142 F.3d at 844. In a four-day trial with forty-two witnesses, the challenged testimony consists of only one sentence. Finally, events subsequent to the inadmissible testimony limited its prejudicial impact. After the witness testified that Freeman had "a criminal history," he noted that Freeman had not been convicted of any crimes. The district court also instructed the jury that Freeman was on trial only for the conduct alleged in the

---

[3] We assume for the sake of deciding that Freeman is correct that the testimony was inadmissible. As Freeman notes, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The government argues, however, that the statement was invited by the questioning of Zamora's counsel, and therefore was not inadmissible. We need not decide this issue to resolve the question before us.

indictment. See id. (noting a similar instruction from the trial judge in affirming the district court).[4]

Second, the other evidence presented by the government was very strong. The government presented many witnesses who testified that Freeman was a major player in the Chapa-Duran drug trafficking organization, including several individuals who testified that they delivered drugs directly to Freeman. The overwhelming amount of testimony provided the jury with more than enough information to tie Freeman to the Chapa-Duran organization. See Millsaps, 157 F.3d at 993.

When we consider all these facts together, we do not find a substantial likelihood that a fleeting reference to "a criminal history" had a substantial impact on the jury's verdict. The district court did not err when it denied Freeman's motion for a judgment of acquittal.

III.

Because we find no reversible error in the rulings of the district court, we AFFIRM the district court's judgments and the defendants' sentences.

---

[4] Freeman did not request and the district court did not provide a curative instruction. The district court seemed to believe that the benefits of doing so in this case would be outweighed by the tendency of such an instruction to call attention to the inadmissible evidence.