# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 11, 2024

Lyle W. Cayce
Clerk

_____

No. 23-60338

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Charles Derryberry,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:22-CR-82-1

_____

Before Smith, Engelhardt, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Appellant-defendant Charles Derryberry ("Derryberry") challenges the district court's denial of his motion to suppress all physical evidence recovered during a vehicular stop and search, which he contends ultimately led to his conviction by a jury of being a felon unlawfully in possession of a firearm. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-60338

## I

On the night of February 27, 2022, Mary Smith[1] ("Smith") and her sister were at their mother's home. Smith's sister told her that Smith's daughter, Jane, was in possession of an ounce of methamphetamine and an ounce of fentanyl and needed to be picked up and driven back to the home. Smith's sister left to pick up Jane and Derryberry—with whom Jane was romantically involved—and bring them back to the home.

Smith had been working "off and on" as a confidential informant ("CI") for the Lafayette County Sheriff's Office ("LCSO"). After her sister left, Smith sent text messages and made phone calls to LCSO Chief Deputy Scott Mills ("Deputy Mills") and Criminal Investigator Brad McDonald ("Investigator McDonald") to report the presence of narcotics in the vehicle that Smith's sister was driving.[2] She informed the officers that these drugs would be transported through Harmontown, a small community nearby, in a white Chevrolet truck. Although the text messages referred only to the "product" Jane had in her possession, Smith provided more detail regarding the types and quantities of narcotics in her phone conversations with the officers. Based on this information, Deputy Mills and Investigator McDonald asked LCSO Captain Jack Theobald ("Captain Theobald") to attempt to locate and stop the truck.[3] Investigator McDonald told Captain Theobald

---

[1] Mary Smith and Jane Smith are aliases. The district court and the parties used these names to refer to the confidential informant and her daughter in all public filings. For clarity, we do the same.

[2] Smith also intended to contact Caleb East, an agent with the Lafayette County Metro Narcotics Unit ("Metro Narcotics"). She was unable to reach him.

[3] Deputy Mills and Investigator McDonald continued to communicate with Captain Theobald throughout the night as he searched for the truck and conducted the eventual traffic stop. Smith did not communicate directly with Captain Theobald before the traffic stop occurred.

No. 23-60338

that the truck was a white, four-door Chevrolet pickup registered to Smith's father.

When Smith's sister returned to the home with Jane and Derryberry, Smith, Jane, and Derryberry left in the truck to search for a missing relative with dementia. They began driving through the Harmontown area. About forty-five minutes later, while driving on the main route through Harmontown, Captain Theobald noticed a truck matching the description he was given. He believed the truck was speeding, so he pursued the vehicle and eventually initiated a traffic stop. Approximately two hours had elapsed between the time Smith contacted Deputy Mills and Investigator McDonald and the beginning of the traffic stop.

Captain Theobald first verified that the truck was registered to Smith's father.[4] He approached the vehicle and saw Jane in the driver's seat, Smith in the passenger seat, and Derryberry lying down across the back seat. Captain Theobald and two other deputies then asked Derryberry to exit the vehicle and, after some initial resistance from Smith and Jane, received consent to search the vehicle. Captain Theobald found a nine-millimeter Smith & Wesson handgun under the back seat, near where Derryberry had been lying. A female officer frisked Smith and Jane and found a pipe inside Jane's jeans. No drugs were found in the vehicle.[5]

---

[4] Captain Theobald acknowledged that the Computer Aided Dispatch ("CAD") report reflected that he had checked the registration for the truck half an hour after he initiated the stop. He explained that was the time at which the call was officially "opened" by dispatch rather than the time at which he actually verified the registration, and the district court accepted that explanation as credible.

[5] Smith testified that no drugs were found because Jane hid them while Captain Theobald and other officers were searching the truck.

Derryberry was arrested and charged in a one-count indictment with being a convicted felon in knowing possession of a firearm. He moved to suppress the handgun and pipe found during the stop on several bases. The district court held a hearing on the motion and took live testimony from several witnesses. Shortly after that hearing, Derryberry's attorney informed the district court that new evidence had been discovered contradicting some of the testimony at the suppression hearing; the district court held a second hearing just a few days later.

Smith testified at both hearings. She acknowledged having been convicted of several criminal offenses in the past, including larceny, counterfeit forgery, false pretense, and prescription fraud. Since her first arrest in 1999, she had provided information to law enforcement "off and on[,]" sometimes to obtain lighter sentences for the crimes she had committed. On cross-examination, Smith confirmed that she had pleaded guilty to auto burglary just two days before the traffic stop. She maintained, however, that her motivation in providing the tip that led to Derryberry's arrest was not to receive a lighter sentence but to help Jane, who was suffering from a severe drug addiction at the time. Smith testified that Jane was "gang banging" and using drugs and had overdosed eighteen times. Smith had previously told Deputy Mills she was worried for Jane's wellbeing and wanted to get her help, and she expressed disappointment to Deputy Mills that the traffic stop did not result in Jane's arrest. She also admitted that she did not like Derryberry and did not approve of his relationship with Jane.

Deputy Mills, Investigator McDonald, and Captain Theobald also testified at the first hearing. Although their testimony was largely congruous, the three officers' stories differed in some respects. For example, Deputy Mills stated that Smith told him Jane was in possession of methamphetamine and fentanyl, but she did not tell him the quantity; Investigator McDonald said that Smith had only told him Jane possessed a substantial amount of

drugs. Deputy Mills recalled only that Smith told him they were traveling in a pickup truck, while Investigator McDonald stated Smith had told him they would be in a white Chevrolet pickup truck.

Following the first suppression hearing, Derryberry filed a memorandum in support of his motion to suppress, citing newly discovered evidence. It alleged that Derryberry's attorney had a conversation following the hearing with Mickey Mallette ("Mallette"), a former Assistant District Attorney for Lafayette County who had negotiated Smith's guilty plea for the automobile burglary she committed two days before Derryberry's arrest. It also alleged that Mallette had stated that Smith's sentence had been deferred because she was working as an informant for Deputy Mills. Based on this new information, the district court held a second suppression hearing.

At that hearing, Mallette testified that it was his understanding that Smith's sentence for the automobile burglary had been deferred so that she could help recover the victim's stolen property. He expressly declined to characterize these efforts as "working off" Smith's charges because she had already pleaded guilty. Deputy Mills clarified his earlier testimony regarding Smith's role as a CI: at the time of Derryberry's arrest, Smith was working as a CI for Metro Narcotics, not for LCSO. He maintained that her motive behind providing the specific tip that led to Derryberry's arrest was getting help for Jane. Smith testified and eventually admitted that she was working for Metro Narcotics in February of 2022 to get a lighter sentence for some unspecified offense. But she also restated that she tipped off the officers on the night of the traffic stop to get help for Jane.

The district court denied the motion to suppress. Derryberry was tried before a jury and convicted of being a felon unlawfully in possession of a firearm. On June 20, 2023, the district court found that Derryberry qualified

as an armed career criminal,[6] and it sentenced him to 327 months of confinement. This appeal followed.

## II

When considering the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (citing *United States v. Solis*, 299 F.3d 420, 435 (5th Cir. 2002)). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001). "Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *Gomez*, 623 F.3d at 269–70 (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005)). We must view the evidence in the light most favorable to the prevailing party below—here, the Government. *See United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (citing *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993)). And we may affirm on any basis supported by the record, *id.* (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th

---

[6] "Under the Armed Career Criminal Act of 1984, a defendant convicted of being a felon in possession of a firearm faces more severe punishment" if he has at least three previous convictions for violent felonies or serious drug offenses. *Johnson v. United States*, 576 U.S. 591, 593 (2015); *see also* 18 U.S.C. § 924(e)(1).

Cir. 1999)), including evidence presented at trial, *United States v. Basey*, 816 F.2d 980, 983 n.1 (5th Cir. 1987).

## III

Derryberry argues that the initial traffic stop was unjustified because Captain Theobald's reasonable suspicion was based on an unverified and ultimately incorrect tip from an unreliable informant.[7]

## A

Under *Terry v. Ohio*, 392 U.S. 1, 20 (1968), the constitutionality of a traffic stop or investigative detention is evaluated using a two-prong analysis. First, we must determine "whether the officer's action was justified at its inception[.]" *Id.* Second, that action must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* As to the first step, "[f]or a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)); *see also Powell*, 732 F.3d at 369 (describing the first step under *Terry* as a determination that "stopping the vehicle was initially justified by reasonable suspicion"). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Macias*, 658 F.3d 509, 519–20 (5th Cir. 2011) (alteration in original) (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006)).

---

[7] The district court was "not convinced that [Captain] Theobald had reasonable suspicion to stop the vehicle for speeding." Accordingly, the only potential justification for the stop was Smith's tip.

Whether the officer had reasonable suspicion to initiate the stop is determined based on the totality of the circumstances. *See Estrada*, 459 F.3d at 631.

Reasonable suspicion can arise based on an informant's tip so long as the information provided boasts some "indicia of reliability." *Powell*, 732 F.3d at 369 (first citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); and then citing *United States v. Zamora*, 661 F.3d 200, 207 (5th Cir. 2011)). In *Powell*, the Fifth Circuit assessed the reliability of an informant's tip using four non-exclusive factors:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

*Id.* (quoting *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)).

**B**

Here, as to the first factor, the district court expressly found pertinent portions of Smith's testimony, and the officers' testimony regarding Smith's reliability, credible. It initially found inconsequential the fact that the text messages between Smith and the officers lacked some of the information Smith purportedly relayed to the officers because Smith had also spoken with the officers over the phone. Although it acknowledged that Smith's failure to reveal at the first suppression hearing that she was working as a CI for Metro Narcotics when the stop occurred undermined her trustworthiness, it found Smith's expressed desire to help Jane credible. The district court "recognize[d] that more than one reason may very well have motivated [Smith's] conduct" and concluded that her "explanation made sense." This finding was bolstered by evidence that Jane's drug problem was very serious, and that Smith had expressed concern regarding Jane's drug use to LCSO

officers before. The district court also recognized Smith's extensive criminal history. Nevertheless, it found that Smith's previous tips over the span of twenty years were generally truthful and reliable and had even led to several arrests and drug seizures.[8] Ultimately, the district court found that the first *Powell* factor "weigh[ed] in favor of the Government."

We must afford the district court's credibility determinations considerable weight. *Gomez*, 623 F.3d at 269–70. Derryberry has not shown that the district court's factual findings are clearly erroneous; the record supports the district court's determinations regarding Smith's overall veracity.

As to the second prong of the *Powell* analysis—the specificity of the information provided—the district court could not "help but question the specificity of the information" Smith relayed to the officers. For instance, it noted the officers' testimony differed regarding the type and quantity of narcotics purportedly present in the vehicle. But Smith's tip also contained several specific, verifiable details: the make, color, and owner of the vehicle they were driving; where they would be traveling; how many people were in the vehicle; and Jane's possession of a significant amount of at least one type of illicit drug. Based on "inconsistenc[ies]" in the officers' testimony regarding what details Smith provided, the district court found that the overall lack of specificity counseled in favor of suppression. The district court's factual conclusion that the specificity of the tip was unclear is plausible in light of the record before us and not clearly erroneous.

---

[8] Derryberry emphasizes there was only "some evidence" that Smith's information had led to "'four to five' arrests." There was no evidence that her tips had led to any convictions.

The district court briefly discussed the third *Powell* factor, finding that the extent to which the information could be verified in the field favored suppression. It specifically noted that Captain Theobald was unable to locate any narcotics, although he was able to verify other details, such as the description, owner, and occupants of the truck. Conversely, it concluded that the fourth *Powell* factor favored the Government because the reported activity was happening in real-time. The district court's factual findings as to these two factors were not clearly erroneous.

The district court also looked to additional considerations in reaching its suppression decision. For instance, it noted that Smith "stayed in contact with law enforcement throughout the encounter, continuing to provide information to them as it occurred." The text messages supported Smith's and the officers' version of events, and any discrepancies as to the type and quantity of drugs present in the vehicle did not become apparent until after the search had been conducted. That officers found a pipe on Jane's person also suggested that the vehicle's occupants used drugs. Considering the totality of the circumstances, Derryberry has identified no clear error in the district court's conclusion that Smith's tip was reliable enough to form the basis of Captain Theobald's reasonable suspicion that criminal activity had occurred or was occurring.

## C

Finally, on appeal and before the district court, Derryberry relied on this court's decision in *United States v. Roch*, 5 F.3d 894 (5th Cir. 1993), for the proposition that Smith's tip, like the informant's tip in that case, was unreliable. In *Roch*, a CI told an officer "that a man named Frank planned to pass some forged checks and threatened to kill the next cop he saw." *Id.* at 896. The CI stated that "Frank possessed two guns, drove a white and orange pickup truck, and was staying in a local motel room with his girlfriend." *Id.*

Frank was described "only as a blond, white male with tattoos on large portions of his body[,]" and the CI did not provide officers with Frank's last name. *Id*.

Officers surveilled the motel for several hours but did not attempt to corroborate any of the CI's information by, for instance, checking the names of the guests currently staying at the motel or locating the truck and checking its registration. *See id*. at 899. Officers also failed to verify Frank's status as a convicted felon. *Id*. at 897. Despite their lengthy surveillance, officers did not observe any conduct giving rise to reasonable suspicion. *Id*. Eventually, a man and a woman exited the motel, got in an orange and white pickup truck, and drove to a nearby gas station. *Id*. at 896. There, officers arrested Roch and found two guns in the vehicle. *Id*. After Roch was convicted, this court overturned his conviction because the CI's tip was not sufficiently detailed to support reasonable suspicion to detain Roch. *Id*. at 899.

*Roch* is distinguishable from this case for several reasons. First, it did not involve a tip about ongoing, real-time criminal activity that is "*per se* illegal*.*" *Id*. Additionally, Smith provided more details than the CI in *Roch*: she identified the passengers in the vehicle and described the vehicle with more specificity, informed officers of where the truck would be traveling, and continued to update officers as the incident was ongoing. And Captain Theobald was able to verify certain important details, such as the owner of the truck, in the field. The district court did not err in concluding that Smith's tip was more reliable than the tip in *Roch*.

This case is more akin to *Adams*, 407 U.S. at 143. There, an informant told a police officer that a man sitting in a nearby vehicle was in possession of narcotics and had a gun in his waistband. *Id*. at 144–45. The Supreme Court concluded that the officer "acted justifiably in responding to his informant's tip" when he conducted an investigative stop. *Id*. at 146. Because the officer

knew the informant and had received information from him in the past, "the information carried enough indicia of reliability to justify the officer's forcible stop[.]" *Id.* at 146–47. The Court also emphasized that the informant "came forward personally to give information that was immediately verifiable at the scene" in a jurisdiction in which the informant could be punished if his tip was untrue. *Id.* at 146. Similarly, here, Smith came forward personally and provided verifiable information about criminal activity occurring in real-time. Smith was known to Deputy Mills and Investigator McDonald and had given them useful information in the past.

And in *Powell*, a CI who had worked for the police in the past notified an officer that a man called "Little Book" and a woman had just left the CI's apartment with considerable amounts of crack cocaine. 732 F.3d at 366. The CI said that the two individuals were en route to Midland, and he provided the make, possible model, and color of the vehicle, as well as the first three digits of the license plate. *Id.* The CI neglected to inform the officer that the CI had actually cooked and sold the crack cocaine to Little Book and the woman. *Id.* at 367. Nevertheless, this court concluded that "[t]he specificity, predictive value, and recency of [the CI's] tip are sufficiently strong to balance the flaws in [the CI's] personal credibility and reliability." *Id.* at 371. In sum, "the reasonable suspicion provided by [the CI's] tip rests on a strong foundation when viewed alongside cases finding reasonable suspicion in similar circumstances." *Id.* (citing *Alabama v. White*, 496 U.S. 325 (1990)).

In this case, Smith provided verifiable, specific details similar to those provided by the CI in *Powell*. For example, she informed officers of the make, color, and owner of the truck, just as the CI in *Powell* informed officers of the make, possible model, and partial license plate. Smith told officers that she, Jane, and Derryberry would be leaving a specific location and traveling to another specific location, narrowing down the possible routes that they could take; the CI in *Powell* did the same. The tip in *Powell* pertained to recent

behavior; Smith tipped off officers in real-time, as the criminal conduct was occurring. And in both cases, circumstances undermined the trustworthiness and credibility of both informants' statements. But here, as in *Powell*, those deficiencies were not enough to overcome the strong indicia of the reliability of Smith's tip, especially since the officers had worked with Smith for two decades and had received reliable, accurate information from her in the past.

For these reasons, the decision of the district court denying Derryberry's motion to suppress is AFFIRMED.