# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 14, 2025

Lyle W. Cayce
Clerk

No. 23-20596

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ANDRES MARTINEZ, JR.,

*Defendant—Appellant*,

CONSOLIDATED WITH

No. 23-20600

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

OSCAR LIGHTNER, *Doctor*,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:18-CR-513-2,
4:18-CR-513-1

---

Before CLEMENT, GRAVES, and WILLETT, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

In 2017, Doctor Oscar Lightner opened Jomori Health and Wellness (Jomori) in Houston, Texas. At Jomori, Lightner prescribed controlled substances to 97% of his patients—many of whom displayed tell-tale signs that they sold the drugs prescribed to them. He often did so without examining the patients first. Some of these patients came to Jomori through "runners." Runners paid a flat fee to reserve spots for the patients they brought into the clinic, sometimes on top of paying for the patients' appointment fees. Andres Martinez, Jr., who worked as Jomori's office manager, often collected these payments. After patients received prescriptions from Lighter, the runners would take the patients to a pharmacy to fill their prescriptions, pay the patients for the pills, and then resell the pills.

A federal grand jury indicted Martinez and Lightner on drug-related crimes under the Controlled Substances Act, 21 U.S.C. § 812 (CSA). Martinez and Lightner pleaded not guilty and went to trial. Following a five-day trial, the jury found Martinez and Lightner guilty of all the charges, and the district court sentenced them each to 84 months of imprisonment. Finding no reversible error, we AFFIRM.

2

No. 23-20596
c/w No. 23-20600

## I.

## A.

In early 2017, Lightner, a doctor licensed in the State of Texas, opened a Houston-area clinic called Jomori.[1] Martinez, Lightner's then-stepson, worked as the manager and operator of Jomori. As part of his role, Martinez checked in with Lightner often.

The office had bullet-proof glass separating patients from the receptionists and cameras recording the premises. Lightner hired guards to "[c]ontrol the crowd" at the clinic and minimize foot traffic standing outside. The cabinets in the treatment rooms were mostly empty, and there were no supplies in the procedure rooms. Patients would line up outside of Jomori and play loud music, smoke marijuana, drink, and urinate in the parking lot.

Martinez opened the office in the morning and checked patients in for appointments. New patients paid $500 for the first visit and $250 for follow-up visits. Included in those costs were prescriptions for hydrocodone and carisoprodol.[2] If Lightner prescribed additional narcotics to a patient, the back office would communicate with the front desk—which included Martinez—to charge the patient another $50. Jomori also had a few "family practice patients" that came to the clinic for colds, obstetrics, and gynecology and paid $50 per visit. Jomori did not accept credit cards, insurance, Medicare, or Medicaid, and patients had to pay in cash. Martinez collected the money and counted it at the end of the day. Many of Jomori's patients appeared homeless and unable to pay Jomori's cash fee.

---

[1] Lightner had previously operated Jomori in Laredo, Texas beginning around 2012.

[2] Hydrocodone is an opioid that goes by the brand names "Vicodin, Norco, and Lortab," and carisoprodol is a muscle relaxant marketed under the name "Soma."

No. 23-20596
c/w No. 23-20600

"Runners" brought groups of five to ten unrelated people into Jomori for appointments, sometimes as frequent as three to four times a day. Runners helped patients fill out paperwork and advised patients what to tell Lightner to receive prescriptions. Runners also paid a $400 cash fee to reserve spots for the patients they brought and sometimes also paid for appointment fees, with Martinez collecting these payments. After the patients received their prescriptions, runners brought them to the pharmacy to fill the prescriptions, paid the patients for their prescriptions, and resold the prescriptions. Patients brought in by runners often composed a significant portion of Lightner's patient load each day.

As the primary, and for a period of time, the sole doctor at Jomori, Lightner wrote prescriptions for his patients using an electronic system that only he could access. He maintained a Drug Enforcement Administration (DEA) registration number that allowed him to issue prescriptions for controlled substances. Between May 2017 and August 2018, Lightner saw 1,766 patients at Jomori and prescribed 97% of them hydrocodone, carisoprodol, and/or alprazolam[3]—meaning only 3% of his patients did not receive a prescription for a controlled substance.[4] It was "a rare event" when Lightner did not prescribe any medication to a patient. As a result of his prescribing practices, some pharmacies stopped filling prescriptions written by Lightner.

Between May 2017 and August 2018, Lightner wrote 11,237 prescriptions for hydrocodone, carisoprodol, and alprazolam products

---

[3] Alprazolam is used to treat anxiety and sometimes prescribed under the brand name "Xanax."

[4] Texas pharmacies report controlled-substance prescriptions for every doctor to the Prescription Monitoring Program.

No. 23-20596
c/w No. 23-20600

totaling over one million pills.[5] Lightner wrote 94 of the hydrocodone prescriptions while he was traveling out of the country and therefore unable to physically assess patients. Even when he was in the office, Lightner did not always conduct physical examinations of his patients before prescribing medications. Further, he would randomly vary the number of pills in the prescriptions and switch patients between carisoprodol and alprazolam without a medical reason. Lightner would also write false statements in patients' medical records and reuse the same language across different patients' files.

Lightner prescribed controlled substances to patients in contravention of Jomori's written policies. Jomori had several office policies specifying criteria that needed to be met, including requiring magnetic resonance imaging (MRI) or X-rays and a clean drug screen, before Lightner could prescribe medications. Those policies went unenforced for the most part. For example, although patients were required to bring in an MRI or X-ray, patients received prescriptions for controlled substances without any imaging or with imaging that did not show that they were in any pain. Further, even though most of Jomori's patients tested positive for drugs they were not prescribed, including marijuana and cocaine, and some tested negative for drugs they were prescribed, Lightner would still prescribe them controlled substances.

Lightner ignored red flags that patients abused and/or sold the drugs he prescribed to them. Those red flags included testing negative for prescribed medications on the drug screen, complaining of the same pain from the same type of accident, traveling long distances to visit Jomori, being

_____

[5] With respect to Lightner's hydrocodone prescriptions, 99.95% of them were for 10 milligrams—the highest strength available on the market.

5

willing to pay for appointments in cash, and visiting several different doctors for pain medications.

As a result of Lightner's prescribing practices, between June 2017 to August 2018, Jomori made over $1.2 million in revenue.

**B.**

In February 2017, a DEA agent interviewed Lightner as part of a routine regulatory interview. During that interview, the DEA agent recognized certain red flags in Lightner's behavior. The agent had also received a complaint of "pill mill activity at Jomori."[6] The DEA pulled Lightner's Prescription Monitoring Program (PMP) report and noticed additional red flags: "[T]he vast majority of the prescriptions were for [hydrocodone and carisoprodol] alone," and patients traveled long distances to visit Jomori. The DEA then implemented investigative measures, such as utilizing confidential informants, querying other prescription databases, conducting undercover purchases of prescriptions, and installing a camera to monitor the clinic.

Michael Edwards, one of the DEA's confidential informants, posed as a runner and patient at Jomori three times, and at each visit, he spoke with Martinez. During his second and third visits, Edwards paid Martinez a $400 fee to hold spots for the patients he brought to Jomori on top of paying those patients' appointment fees.

---

[6] "A 'pill mill' is a colloquial term for a medical clinic in which practitioners distribute controlled substances without 'medical necessity or therapeutic benefit.'" *United States v. Capistrano*, 74 F.4th 756, 765 n.1 (5th Cir.) (citing *United States v. Lee*, 966 F.3d 310, 317 (5th Cir. 2020)), *cert. denied*, 144 S. Ct. 516 (2023), *reh'g denied,* 144 S. Ct. 882 (2024).

No. 23-20596
c/w No. 23-20600

After obtaining search warrants, the DEA searched Jomori and uncovered empty treatment rooms. DEA agents also searched Lightner's truck, finding around $25,000 in cash, sign-in sheets with Martinez's handwriting, and Martinez's passport, among other items.

The agents seized and forensically imaged Lightner's computers, and then returned the computers to Lightner. The computers held a database called eClinical, which Lightner used before he opened Jomori in Houston to house patient medical records until February 2017 (prior to the start of the indicted conspiracy).

## C.

A federal grand jury in the United States District Court for the Southern District of Texas indicted Martinez and Lightner on drug-related crimes under the CSA. The grand jury later returned a superseding indictment. That indictment charged Martinez and Lightner with conspiracy to distribute and dispense controlled substances in violation of 21 U.S.C. § 846 for activity between May 2017 and August 2018 (Count One) and unlawfully distributing and dispensing controlled substances and aiding and abetting in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 in connection with providing hydrocodone to patient M.E. on May 29, 2018 (Count Three). M.E. refers to Michael Edwards, one of the confidential informants. The indictment also charged Lightner with an additional count for distributing and dispensing and aiding and abetting in connection with providing hydrocodone to patient D.R. on October 12, 2017 (Count Two).

Before trial began, Lightner filed motions in limine seeking to preclude the introduction of certain patient information "on grounds of the DEA's

7

No. 23-20596
c/w No. 23-20600

reckless and bad faith spoliation of exculpatory evidence."[7] Lightner claimed that the DEA had deleted or destroyed from his computer his "entire eClinical Works medical database, which contained the medical files of Dr. Lightner's patients from January 2003 through February 2017." Lightner later filed a motion to compel the return of the eClinical files. He claimed that the files "would reveal that the majority of [his] practice were non-pain patients." The district court concluded that there was no "basis other than [a] technical difficulty to believe that the Government has either failed to provide what it imaged following the seizure or that it has deleted or altered the contents." The court ordered the parties to meet and ordered the government to provide Lightner access to the files. The district court also instructed Lightner's counsel to approach the bench during the trial if they wanted to mention the alleged spoliation of Lightner's eClinical files or any patients Lightner saw before he opened Jomori in Houston. At no point during the trial did Lightner's counsel request the court's permission to speak about the DEA's spoliation of the eClinical files.

Throughout the five-day trial, the government called witnesses, including a former Jomori patient, confidential informants, and a medical expert, and introduced recordings, patient files, and other documents and photographs. After the government rested, Martinez moved for judgment of acquittal. The district court denied Martinez's motion. During Lightner's defense, he testified and called three former Jomori patients. Martinez did not call any additional witnesses. After the defense rested, Martinez renewed his motion for judgment of acquittal, which the district court again denied. The jury found Martinez and Lightner guilty on all counts.

---

[7] Lightner also filed a motion to dismiss arguing in part that the charges should be dismissed on account of the DEA's spoliation of his eClinical files.

At sentencing, the district court adopted the calculations from the presentence investigation report (PSR) and calculated Lightner's Sentencing Guidelines range as 360 months-to-life imprisonment with a statutory maximum of 720 months' imprisonment. The district court varied downward from the Guidelines range "in light of Dr. Lightner's age and his health conditions" and imposed an 84-month term of imprisonment for Counts One, Two, and Three to run concurrently. The district court sentenced Martinez to 84 months' imprisonment on Counts One and Three to run concurrently. Martinez and Lightner timely appealed.

## II.

Martinez raises two issues on appeal: (A) whether the evidence for his conviction under Count One was sufficient, and (B) whether the evidence for his conviction under Count Three was sufficient. Because we find the evidence sufficient for Counts One and Three, we AFFIRM the district court as to Martinez.

Where a defendant properly preserves a sufficiency challenge, as Martinez did here by moving for judgment of acquittal at the close of the government's case and the defense, FED. R. CRIM. P. 29(a); *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002), the court reviews the challenge de novo. *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 72 (2023).

The court will uphold the jury's verdict if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Daniels*, 723 F.3d 562, 569 (5th Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), *reh'g granted in part on other grounds,* 729 F.3d 496 (5th Cir. 2013). This review is "'highly deferential' to the jury's finding of guilt." *Capistrano*, 74 F.4th at 766 (quoting *United States v.*

*Zamora-Salazar*, 860 F.3d 826, 831 (5th Cir. 2017)). The jury can "choose among reasonable constructions of the evidence." *Id.* (quoting *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994)). The court must accept the jury's credibility determinations and reasonable inferences. *Davis*, 53 F.4th at 842. "Our inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017). However, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference," or "an unwarranted inference, the determination of which is a matter of law." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (first quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996); then quoting *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980)).

## A.

To establish a conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt: "(1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." *Capistrano*, 74 F.4th at 768 (quoting *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011)). A violation of narcotics law occurs when a conspirator "unlawfully distribute[s] or dispense[s] a controlled substance outside the scope of professional practice and without a legitimate medical purpose." *Lee*, 966 F.3d at 316 (quoting *Oti*, 872 F.3d at 687).

The government can establish each element through circumstantial evidence if "each link in the inferential chain [is] clearly proven." *United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997) (quoting *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir. 1982)). "The agreement may be tacit, and the jury may infer its existence from circumstantial evidence." *United States*

No. 23-20596
c/w No. 23-20600

*v. Cervantes*, 107 F.4th 459, 466 (5th Cir. 2024) (quoting *United States v. Scott*, 892 F.3d 791, 797 (5th Cir. 2018)).

Martinez's primary contention is that the government did not produce sufficient evidence of a conspiratorial agreement between (1) himself and Lightner and (2) himself and Edwards. Because the government did not seek to establish a conspiracy between Martinez and Edwards, our analysis focuses on the relationship between Martinez and Lightner.

Martinez places much weight on the fact that Lightner testified that no agreement existed. But this court cannot reweigh the jury's credibility determination as it pertains to Lightner. *See Davis*, 53 F.4th at 842. The jury chose to not believe Lightner's testimony and instead to credit the evidence they heard about Martinez's involvement with the runners and collecting cash from patients. That choice was reasonable. *See Oti*, 872 F.3d at 686.

Martinez also argues in reliance on *Ganji* that the jury cannot convict him because he only played a minor role and never wrote prescriptions. But in this circuit, "even if he only played a minor role in the conspiracy," he could be convicted of a conspiracy; "and a defendant need not know all of the specific details of the conspiracy . . . and need not have ever physically touched any of the drugs involved in the conspiracy." *Daniels*, 723 F.3d at 575.

*Ganji* is also distinguishable from the facts here. In *Ganji*, this court concluded that the government provided insufficient evidence to prove that a doctor at a home health agency and the co-owner of the agency engaged in "concerted action" to defraud Medicare. 880 F.3d at 767–77. There, the government witnesses did not implicate the doctor, the doctor and co-owner provided good-faith explanations for their behavior, and the government did not rebut those explanations. *Id.* at 770–77.

11

No. 23-20596
c/w No. 23-20600

In contrast, here, the government provided sufficient evidence of a conspiratorial agreement between Martinez and Lightner, and Martinez did not rebut the government's evidence at trial. Martinez helped facilitate runners bringing patients to Jomori, charged runners an additional $400 convenience fee to hold spots for the patients they brought to Jomori, and collected lump-sum payments from runners as payment for multiple patients' prescriptions. *See Lee*, 966 F.3d at 318 (evidence of pill mill activity when "one man would sometimes pay for several patients' prescriptions").

Martinez's interactions with the confidential informant who posed as a runner, Edwards, support that he knew of and voluntarily agreed to participate in Lightner's scheme. Martinez and Edwards discussed Lightner's prescribing practices in the course of their interactions. During one visit, Edwards asked Martinez whether Lightner was reducing the number of pills in prescriptions. In response, Martinez first asked what Edwards meant, then said that new patients typically receive sixty pills and went to confirm with the nurse practitioner. When Martinez returned, he explained that Lightner "may not want to write Somas anymore" because of attention from the DEA. Martinez argues that his "surprised" response to Edwards's question—asking what Edwards meant—demonstrates his lack of knowledge about Lightner's prescribing practices. But it was reasonable for the jury to not interpret this conversation as indicating Martinez's ignorance of Lightner's practices, particularly in light of Martinez and Edwards's conversations as a whole.

Immediately after Martinez's alleged "surprised" response to Edwards's question, Martinez informed Edwards of a "loophole" to receive a carisoprodol prescription. Martinez also advised Edwards to list certain symptoms on his paperwork to reflect a need for carisoprodol or alprazolam. Further, Martinez knew that patients would test positive for non-prescribed controlled substances, but informed Edwards that it did not matter, another

12

indication of Martinez's awareness of pill-mill activity. *Id.* ("A positive test for an illegal drug, such as cocaine, is a warning sign in flashing neon.").

Most alarmingly, Martinez seemed to know that patients did not actually take the prescriptions Lightner wrote for them. Martinez told Edwards that patients only needed to test positive for the medications Lightner had prescribed—by taking prescriptions three or four days in advance—to make it look like they actually used the medications. *Id.* ("Less apparent but no less damning is a negative test for a prescribed drug: it is a red flag that the so-called patient is selling medications rather than using them."). Martinez also knew that Edwards would bring people from homeless shelters. *Oti*, 872 F.3d at 688 (evidence of a pill-mill scheme where "[s]everal witnesses testified that many of the clinic's patients were obviously homeless and could not afford a $150 or $190 doctor visit or the prescriptions Iwuoha and the other providers wrote").

The secretive nature of Martinez and Edwards's interactions also supports the jury's finding of a conspiratorial agreement between Martinez and Lightner. Martinez met with Edwards in the back office at Jomori and asked him to be discrete about signing multiple patients in for appointments. Acknowledging that Jomori does "legitimate stuff [like] records," Martinez told Edwards that "we try to keep things very tight . . . because you don't want the whole world to know what business we are doing." Given these circumstances, it was not unreasonable for a jury to interpret Martinez and Edwards's interactions as going beyond just reserving appointment spots, and instead indicative of Martinez's knowing and voluntary participation in a scheme with Lightner to provide controlled substances for a non-medical purpose.

Beyond his interactions with Edwards, the jury also heard that Martinez collected payments from patients for appointments and charged

No. 23-20596
c/w No. 23-20600

patients an additional $50 when Lightner prescribed medications beyond the two included in the initial fee. These payments were all in cash, and Jomori did not accept insurance, Medicare, or Medicaid, indications of pill-mill activity. *Id.* at 684–85, 688–89 (identifying cash payments and not taking Medicaid and insurance as signs of pill-mill activity). Martinez knew that it was rare for Lightner not to prescribe medications. The jury also heard that Martinez sat behind bulletproof glass in the reception area and would have noticed guards at Jomori. Further, during the DEA's search of Jomori and Lightner's car, the DEA found Martinez's passport along with $14,000 in a bag in Lightner's car.

Viewed together, in the light most favorable to the government, a rational jury could have found the evidence sufficient to support Martinez's conviction under Count One. Therefore, the district court did not err in denying Martinez's motion for judgment of acquittal and renewed motion on this basis.

## B.

Regarding Count Three, the court provided the jury with three separate instructions: liability under *Pinkerton v. United States*, 328 U.S. 640 (1946); the substantive crime; and aiding and abetting. Martinez only argues that the government did not provide sufficient evidence as to the aiding and abetting charge, whereas the government argues that evidence was sufficient to establish *Pinkerton* liability and aiding and abetting.

"Questions posed for appellate review but inadequately briefed are considered abandoned." *Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993). Even though Martinez failed to develop, and therefore abandoned, his argument as to *Pinkerton* liability, *see Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) ("We will not

raise and discuss legal issues that [a party] has failed to assert."), any argument would nevertheless fail on the merits.

> Under *Pinkerton*,
>
> conspirators are criminally liable for substantive crimes committed by other conspirators in furtherance of the conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."

*United States v. Gonzales*, 841 F.3d 339, 344 n.4 (5th Cir. 2016) (quoting *Pinkerton*, 328 U.S. at 647–48). Neither Martinez nor Lightner challenge the predicate offense, that Lightner wrote a prescription for Edwards on May 29, 2018. *United States v. Ajayi*, 64 F.4th 243, 248 (5th Cir. 2023) (per curiam).

There is sufficient evidence to support that the May 29, 2018, prescription for Edwards occurred within the scope of the conspiracy and in furtherance of the conspiracy. Lightner wrote the prescription during the ongoing conspiracy between May 2017 and August 2018. The jury could infer from the evidence at trial that Martinez could have reasonably foreseen that Lightner would write a prescription for hydrocodone for a non-medical purpose, particularly because Martinez advised Edwards how to obtain a carisoprodol prescription. The evidence also showed Martinez's awareness that patients, including Edwards, may not use the prescription for a legitimate medical purpose: He advised Edwards that he only needed to take the prescriptions three to four days before a drug screen to test "dirty."

Viewed together, in the light most favorable to the government, a rational jury could have found that the evidence was sufficient to support

No. 23-20596
c/w No. 23-20600

Martinez's conviction on Count Three under *Pinkerton*.[8] Therefore, the district court did not err in denying Martinez's motion for judgment of acquittal and renewed motion on this basis.

## III.

Lightner raises five issues on appeal: (A) whether the district court erred in issuing the jury instructions as to the conspiracy count; (B) whether the district court erred in failing to sanction the government regarding Lightner's eClinical patient files; (C) whether the district court erred in declining to strike a government witness's testimony; (D) whether the district court's cumulative errors infected the outcome of the trial; and (E) whether the district court erred in calculating the drug weight attributable to Lightner for his base offense level, applying the two-level sentencing enhancement under U.S.S.G. § 2D1.1, and applying the four-level sentencing enhancement under U.S.S.G. § 3B1.1(a).

## A.

### 1.

"Generally, this court reviews jury instructions for abuse of discretion and harmless error. However, when a defendant fails to object to jury instructions, we review for plain error." *Capistrano*, 74 F.4th at 769 (footnotes and internal quotation marks omitted). Lightner did not object to the jury instructions as to the second and third elements for the conspiracy charge so this court reviews the claim for plain error. *United States v. Pierre*,

---

[8] Because the evidence is sufficient to convict Martinez for Count Three under *Pinkerton*, we need not address the separate basis for Martinez's conviction in Count Three, aiding and abetting, although, for the reasons provided above, the evidence is likely also sufficient. *United States v. Rodriguez*, 553 F.3d 380, 391 (5th Cir. 2008) ("Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction." (quoting *United States v. Singh*, 922 F.2d 1169, 1173 (5th Cir. 1991))).

No. 23-20596
c/w No. 23-20600

88 F.4th 574, 578 & n.2 (5th Cir. 2023) (reviewing for plain error when the defendant challenged a portion of the jury instructions during the trial but raised a different challenge to the jury instructions on appeal).

Under the plain error standard, the defendant must show that "(1) the district court erred, (2) the error was clear or obvious, [and] (3) the error affected his substantial rights." *Capistrano*, 74 F.4th at 769 (quoting *In re Deepwater Horizon*, 824 F.3d 571, 583 (5th Cir. 2016) (per curiam)). "If these three conditions are met, we will use our discretion to correct the error if it 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'" *United States v. Meyer*, 63 F.4th 1024, 1033 (5th Cir.) (alterations in original) (quoting *United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001)), *cert. denied*, 144 S. Ct. 312 (2023).

## 2.

The government has the burden to "prove beyond a reasonable doubt the defendant's guilt of 'every element of the charged offense.'" *United States v. Johnson*, 718 F.2d 1317, 1320–21 (5th Cir. 1983) (quoting *Moore v. United States*, 429 U.S. 20, 22 (1976) (per curiam)). For a conspiracy charge, that means that the government needed to prove that Lightner (1) reached an agreement with Martinez, (2) knew the unlawful purpose of that agreement, and (3) joined the agreement willfully or with intent to further its unlawful purpose; and needed to prove the same for Martinez with respect to Lightner. *Capistrano*, 74 F.4th at 768; Pattern Crim. Jury Instr. 5th Cir. 2.97 (2024).

On the conspiracy charge, the district court instructed the jury that:

For you to find either defendant guilty of this crime, the government must prove each of the following beyond a reasonable doubt:

No. 23-20596
c/w No. 23-20600

| | |
|---|---|
| *First*: | That *Dr. Lightner and Mr. Martinez*, directly or indirectly, reached an agreement to knowingly or intentionally distribute or dispense controlled substances through prescriptions not for a legitimate medical purpose and not in the usual course of Dr. Lightner's professional practice; |
| *Second*: | That *either Dr. Lightner or Mr. Martinez, or both*, knew of the unlawful purpose of the agreement; and, |
| *Third*: | That *either Dr. Lightner or Mr. Martinez, or both*, joined in the agreement willfully, that is, with the intent to further its unlawful purpose. |

Lightner argues that the district court erred by "direct[ing] the jury that if Mr. Martinez knew of the unlawful purpose of the agreement—and not Dr. Lightner—they could still find Dr. Lightner guilty of conspiracy." He argues that this error was compounded by the district court's instruction on the substantive counts (Counts Two and Three), which required the government to prove each element for each defendant beyond a reasonable doubt.

We agree. The district court clearly erred in drafting the jury instructions to only require that the government prove that *either* Lightner *or* Martinez knew of the unlawful purpose of the agreement and joined the agreement willfully. The government must prove knowledge and willful joining of the conspiracy for *both* Lightner and Martinez. *See Capistrano*, 74 F.4th at 768; Pattern Crim. Jury Instr. 5th Cir. 2.97 (2024).

However, "an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Capistrano*, 74 F.4th at 771 (quoting *Neder v. United States*, 527 U.S. 1, 9 (1999)). To justify reversal, the error must affect the defendant's substantial rights. *Id.* A jury-instruction

18

error can affect substantial rights if it is prejudicial, meaning "there is a reasonable probability that the result of the proceedings would have been different but for the error." *Id.* (quoting *United States v. Johnson*, 943 F.3d 214, 223 (5th Cir. 2019)).

Lightner does not argue that but for the use of "or" in the second and third elements of the conspiracy instruction, there is a reasonable probability that he would have been acquitted. But even if he made this argument, he would not succeed. The government provided ample evidence that Lightner knew of the unlawful purpose of his agreement with Martinez—to provide controlled substances to his patients for a non-medical purpose and outside the course of his usual practice—and intended to further this purpose to make money. The evidence showed that patients paid $500 for first-time visits and $250 for follow-up visits and that these charges included two prescriptions, hydrocodone and carisoprodol. If Lightner prescribed an additional controlled substance, the back office communicated that to the front desk—which Martinez operated—to charge the patient an extra $50. Lightner also prescribed controlled substances to patients brought to Jomori by runners. The more Lightner prescribed, the more money he made.

Lightner also ignored clear signs that his patients abused and/or sold drugs: He knew that his patients routinely tested positive for marijuana and cocaine and tested negative for the narcotics he prescribed them, that they traveled far distances to Jomori, that they often saw multiple doctors, and that patients often came into the clinic complaining of the same type of back pain arising from a car accident. Despite these red flags, and often in contravention of Jomori's written policies, Lightner prescribed patients narcotics anyways. Lightner also did not always conduct physical examinations of his patients before prescribing controlled substances to them, sometimes wrote prescriptions when he was outside of the country, and used identical language across various patients' notes.

Considered as a whole, the government presented the jury with enough evidence that Lightner knew of his agreement with Martinez to provide controlled substances to his patients for a non-medical purpose and outside the course of his usual practice and that Lightner intended to further this unlawful purpose. *Pierre*, 88 F.4th at 581–82 (concluding that the defendant could not show that error affected his substantial rights in light of similar evidence presented at trial). Accordingly, Lightner cannot show that any error in the jury instructions as to the conspiracy count (Count One) affected his substantial rights.

**B.**

**1.**

Lightner next argues that the district court erred by not sanctioning the government for the alleged destruction of his eClinical files. This court reviews a trial court's decision on a motion for sanctions for spoliation of evidence or its decision regarding a spoliation instruction for abuse of discretion. *United States v. Glenn*, 935 F.3d 313, 320 (5th Cir. 2019); *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).

A party can waive or forfeit an argument or right. "Waiver . . . 'is the intentional relinquishment or abandonment of a known right.'" *United States v. Cabello*, 33 F.4th 281, 295 (5th Cir. 2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). This court treats "[w]aived errors [as] entirely unreviewable." *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995). "Forfeiture is the 'failure to make the timely assertion of a right.'" *Cabello*, 33 F.4th at 295 (quoting *Olano*, 507 U.S. at 733). This court reviews forfeited arguments for plain error. *Id.*

No. 23-20596
c/w No. 23-20600

**2.**

The government argues that Lightner's counsel waived the spoliation argument at the final pretrial conference. Waiver is an extreme outcome that we do not find warranted here. During the pretrial conference, Lightner's counsel conceded that their "IT expert is still going through the drives, but [counsel] d[idn't] think" the evidence allegedly spoliated by the DEA was "an issue for this trial anymore." These statements are ambiguous—they do not state an affirmative desire to relinquish the spoliation issue. *See United States v. Arviso-Mata*, 442 F.3d 382, 384 (5th Cir. 2006) (indicating that counsel must affirmatively abandon a known right to waive it); *cf. Wood v. Milyard*, 566 U.S. 463, 474 (2012) (finding waiver where "the State knew it had an 'arguable' statute of limitations defense . . . yet it chose, *in no uncertain terms*, to refrain from interposing a timeliness 'challenge' to Wood's petition" (emphasis added) (citation omitted)). We therefore err on the side of caution and conclude that Lightner did not waive his spoliation argument. *See, e.g.*, *United States v. Taylor*, 973 F.3d 414, 419 n.14 (5th Cir. 2020) (concluding that a defendant did not waive the right to appeal his sentence when he requested that the sentences run concurrently but did not object to the ambiguity issue he raised on appeal); *United States v. Sanchez-Hernandez*, 931 F.3d 408, 411 n.2 (5th Cir. 2019) ("The district court asked if 'everything else [in the PSR was] correct.' [The defendant] said 'Yes.' But the record does not reveal which right [the defendant] intended to waive by saying 'Yes.' And when it comes to waivers, such ambiguities are insufficient to extinguish an error." (first alteration in original)).

**3.**

In the alternative, the government argues that "Lightner forfeited this claim when he informed the district court that it was not an issue for trial," and therefore plain error review applies. Lightner asserts that because his

21

counsel raised the spoliation issue in pretrial motions and the district court ruled on the issue, his counsel did not need to raise spoliation again during trial to preserve the issue for appeal. We need not resolve whether Lightner forfeited his argument because it fails even under the more rigorous abuse of discretion standard. *See United States v. Rao*, 123 F.4th 270, 279 (5th Cir. 2024).

"Spoliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman*, 804 F.3d at 713 (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010)). If a party raises a claim of spoliation, "a court may give an adverse-inference instruction" or sanction the party that altered or destroyed evidence upon a showing of bad faith. *United States v. Rodriguez-Sanchez*, 741 F. App'x 214, 221 (5th Cir. 2018) (per curiam); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman*, 804 F.3d at 713.

Lightner argues that the DEA acted in bad faith because the DEA not only destroyed evidence from the eClinical database, but also directed the Houston Police Department not to investigate Lightner's concerns that someone was using his name to write prescriptions for controlled substances and "directed [and paid] four confidential informants to infiltrate [Jomori] and incriminate Dr. Lightner." We disagree.

Much of Lightner's argument relies on *Van Winkle v. Rogers*, 82 F.4th 370 (5th Cir. 2023), but that case is distinguishable. In *Van Winkle*, the district court found that one of the defendants intentionally destroyed adverse evidence but ultimately denied the plaintiff's motions for sanctions because the plaintiff's arguments regarding bad faith were "highly speculative." *Id.* at 375 (internal quotation marks omitted). This court

concluded that the district court abused its discretion by denying the motion for sanctions because there was sufficient evidence to create a genuine dispute of material fact as to whether the defendant destroyed the evidence in bad faith. *Id.* at 379.

Here, in contrast, there is not sufficient evidence to create a genuine dispute of material fact as to whether the government knew the evidence was relevant and destroyed the files in bad faith. In response to Lightner's motions in limine regarding the eClinical files, the government argued that the eClinical files were irrelevant because they pertained to Lightner's work outside of the conspiracy period as defined in the superseding indictment. And regarding bad faith, nothing in the record shows that the DEA intentionally destroyed or altered the eClinical files. Even Lightner's counsel at one point conceded that "the defense does not accuse the DEA of intentionally deleting the drives." Moreover, the government took multiple steps to return the evidence to Lightner, and Lightner's counsel acknowledged that he could access some of the eClinical files.

The only arguments Lightner makes regarding bad faith point to actions allegedly taken by the government—the government's interactions with the Houston Police Department and its decision to use confidential informants at Jomori—that are unrelated to the eClinical files and insufficient to create a genuine dispute of material fact. Lightner provides no evidence in the record supporting his argument that the DEA instructed the Houston Police Department not to investigate his complaints. The decision to use confidential informants—without allegations of additional wrongdoing—also does not demonstrate bad faith, but rather is a standard investigative procedure used by the government. 30 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 6544 (2d ed. 2024).

No. 23-20596
c/w No. 23-20600

Based on the evidence before it, the district court did not send the issue of bad faith to the jury and did not impose sanctions on the government because it concluded that a technical difficulty—rather than the government's bad faith—either deleted or altered the files or prevented the government from returning the files. That was not an abuse of discretion. *Glenn*, 935 F.3d at 320 (concluding that the district court did not abuse its discretion in finding no bad faith or not sending the issue to the jury where "the overwriting of data occurred when Lehman, after several failed attempts to image the laptop, tried a different imaging method and inadvertently triggered an automatic update that had already been installed on Glenn's computer, thereby erasing data on Glenn's hard drive").

## C.

### 1.

The next issue on appeal is whether the district court erred in declining to strike the testimony of a government witness and former patient at Jomori, Holly Kadlec.

Generally, "[t]his court reviews a district court's evidentiary decisions for an abuse of discretion," subject to harmless error. *United States v. Hicks*, 389 F.3d 514, 522 (5th Cir. 2004) (citing *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993)). However, "[a] party who inadequately briefs an issue is considered to have abandoned the claim." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994); *Dardar*, 985 F.2d at 831. A brief "must contain: . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). When a party inadequately briefs an issue, this court need not review the issue. *See Dardar*, 985 F.2d at 831.

24

No. 23-20596
c/w No. 23-20600

**2.**

Before Kadlec testified, the government requested her PMP[9] report from Colorado several times but never received it. At trial, Kadlec testified that she became addicted to hydrocodone and carisoprodol after Lightner increased her medication and that her addiction "destroyed [her] life." She claimed that she needed to move to Colorado "to remove [her]self from the situation and start over." When asked whether she has worked hard to get clean in Colorado, she replied, "I am," and that she "went to several years of therapy," "immediately stopped taking [the medications]," and "avoided pain pills for the fear of the addiction." Lightner's counsel cross examined Kadlec about her addiction and recovery.

The day after Kadlec's testimony—and after she returned to Colorado—the government received her PMP report. The report showed that Kadlec received hydrocodone, oxycodone, and alprazolam prescriptions after moving to Colorado. The government notified the court and defense counsels of the report the day the government received it and offered to stipulate to Kadlec's prescriptions as provided in the report. Lightner's counsel opposed the stipulation and moved to strike Kadlec's testimony, arguing that she had perjured herself. The court denied the motion. In the alternative, Lightner's counsel asked "for the jury to see that [Kadlec had] taken the prescriptions in Colorado." Ultimately, the court read a stipulation to the jury recounting that Kadlec received prescriptions in Colorado for the medications listed in the report and added that "[t]his data does not reflect whether a person has taken or consumed controlled substances."

---

[9] To refresh, the PMP report is a prescription monitoring program report that can list a patient's prescriptions and the prescriptions that a doctor wrote.

25

No. 23-20596
c/w No. 23-20600

On appeal, Lightner argues that the district court erred in denying his motion to strike because "justice required that Kadlec's testimony be stricken to ensure that [Lightner] received a fair trial." Lightner contends that because Kadlec was "an indispensable part of the Government's case-in-chief," the parties' stipulation as to Kadlec's prescriptions in Colorado was no substitute for testing Kadlec's credibility on cross-examination. The stipulation, Lightner argues, "cannot replace the emotive and expressive testimony from Kadlec," and the district court's charge did not instruct the jury that Kadlec ingested the medications she was prescribed in Colorado.

Lightner offers five citations to case law, and four of those five cases are irrelevant because they do not touch upon whether justice required the district court to strike Kadlec's testimony. *United States v. Marquez*, 523 F. App'x 269, 270 (5th Cir. 2013) (per curiam) (concluding that the district court did not err in declining to strike a witness's testimony because the motion in limine did not cover the testimony); *United States v. Crawley*, 533 F.3d 349, 353–55 (5th Cir. 2008) (concluding that the district court did not err in admitting extrinsic evidence under Federal Rule of Evidence 404(b)); *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868–69 (5th Cir. 1962) (dealing with motions to strike allegations in the complaint, not a witness's testimony); *see generally United States v. Morris*, 568 F.2d 396 (5th Cir. 1978) (does not involve a motion to strike).

Lightner also cites to *United States v. Norwood*, 931 F.2d 297 (5th Cir. 1991), but *Norwood* does not support his argument. There, the court evaluated whether the district court erred in striking the testimony of a *defense* witness. *Id.* at 298–99. On this basis alone, the case is distinguishable from the issue here, whether the district court erred in denying a motion to strike the testimony of a *government* witness. But even if we were to apply *Norwood* to these facts, Lightner's argument still comes up short. The court in *Norwood* explained that "'[s]triking the testimony of a witness is a drastic

26

remedy. It is not to be lightly done.' . . . The inability to inquire into [credibility] matters on cross-examination does not warrant striking a witness's testimony unless the purpose of the process is frustrated." *Id.* at 299 (quoting *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988)). The *Norwood* court concluded that the purpose of the process was not frustrated because the defense witness's credibility could be impeached through other means—namely, calling a parole officer to testify about the witness's prior convictions rather than re-calling the witness. *Id.*

Lightner provides no case law supporting his position that reading the stipulation to the jury, rather than bringing Kadlec back for additional cross-examination, undermined the pursuit of truth. In fact, the stipulation the court read to the jury—which informed the jury that Kadlec received prescriptions for hydrocodone, alprazolam, and other narcotics in Colorado—provided a method to impeach Kadlec's credibility: It contradicted her testimony that she avoided pain pills even if it did not go as far as informing the jury that Kadlec took the prescriptions, like Lightner's counsel wanted. *See id.* Lightner does not provide case law to support that the purpose of the process was frustrated because cross-examination would have been a more effective impeachment tool than the stipulation.

Because Lightner failed to adequately brief his argument that the district court erred by denying his motion to strike as required by justice, he abandons that argument. *United States v. Stalnaker*, 571 F.3d 428, 433 (5th Cir. 2009); *Dardar*, 985 F.2d at 831. But even if he had not abandoned it, and assuming for the sake of analysis that the district court erred in denying Lightner's motion to strike Kadlec's testimony, any error is harmless because the government introduced ample other evidence from which the jury could convict Lightner on the conspiracy and substantive counts. *See supra* Part III.A.2; *infra* Part III.E.1.

No. 23-20596
c/w No. 23-20600

To the extent that Lightner seeks to revive the cumulative argument he made in the district court—that Kadlec's testimony should be struck because she perjured herself—that argument is also abandoned and therefore not ripe for review. Lightner failed to brief any perjury argument in his opening brief, Fed. R. App. P. 28(a)(8)(A); *United States v. Fernandez*, 770 F.3d 340, 344 n.9 (5th Cir. 2014) (concluding that a party abandons an argument when the party does not directly state the argument in the brief or provide record citations), and emphasized in his reply brief that "[p]erjury is not the crux of [his] claim."[10]

**D.**

Lightner next asserts that the district court cumulatively erred in instructing the jury on Count One, failing to sanction the government for spoliation, and denying the motion to strike Kadlec's testimony.

"[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (alterations in original) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)). The doctrine "justifies reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *Id.* at 344 (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). This court has held that "the cumulative error doctrine

---

[10] The government interprets Lightner's argument "to be grounded in" *Napue v. Illinois*, which held that prosecutors violate the due process clause of the Fourteenth Amendment if they use or fail to correct known false witness testimony. 360 U.S. 264, 269 (1959). Because Lightner did not brief *Napue* in his opening brief and essentially concedes that two of the four elements of the *Napue* test do not apply here, we need not review this argument. Fed. R. App. P. 28(a)(8)(A); *Fernandez*, 770 F.3d at 344 n.9.

necessitates reversal only in rare instances." *United States v. Stanford*, 823 F.3d 814, 842 (5th Cir. 2016) (quoting *Delgado*, 672 F.3d at 344). "[T]he possibility of cumulative error is often acknowledged but practically never found persuasive." *Delgado*, 672 F.3d at 344 (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)).

As explained *supra* in Parts III.B and III.C, the district court did not err in failing to sanction the government, and Lightner abandoned his argument regarding the motion to strike. That leaves one error, the district court's instruction on Count One. *Stanford*, 823 F.3d at 842 ("[N]on-errors have no weight in a cumulative error analysis." (quoting *Delgado*, 672 F.3d at 344)). But one error alone cannot constitute cumulative error. *Delgado*, 672 F.3d at 344; *see also United States v. Herman*, 997 F.3d 251, 275 (5th Cir. 2021) (indicating that more than one error is required under the cumulative error doctrine). Further, "[a]ny mistakes must be measured against the weight of the evidence presented." *United States v. Moparty*, 11 F.4th 280, 299 (5th Cir. 2021), and here, the government provided enough evidence to support Lightner's convictions on Counts One, Two, and Three. The cumulative error doctrine, therefore, does not apply.

### E.

Lightner raises three sentencing errors on appeal: (1) the calculation of the drug weight attributed to him, (2) the imposition of a two-level premises enhancement, and (3) the imposition of a four-level leadership enhancement.

When a defendant raises an issue for the first time on appeal, this court "appl[ies] the more deferential plain error review." *United States v. Aderinoye*, 33 F.4th 751, 754 (5th Cir. 2022). When a sentencing challenge is preserved, this court "review[s] the district court's interpretation of the

Sentencing Guidelines de novo and its findings of fact for clear error." *Id.* (citing *United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009)).

The calculation of drug weight and application of the premises and leadership enhancements are factual findings reviewed for clear error. *United States v. Lucio*, 985 F.3d 482, 485 (5th Cir. 2021) (drug weight or quantity); *United States v. Guzman-Reyes*, 853 F.3d 260, 263 (5th Cir. 2017) (premises enhancement); *United States v. Warren*, 986 F.3d 557, 567–68 (5th Cir. 2021) (leadership enhancement). This court treats a district court's "[f]actual findings regarding sentencing factors [with] considerable deference." *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005) (quoting *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998)). "A factual finding is not clearly erroneous [as] long as it is plausible in light of the record as a whole." *Mauskar*, 557 F.3d at 232 (quoting *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005)). If a district court "relies upon erroneous information or assumptions," this court must "remand to the district court for a new sentencing hearing." *United States v. Gentry*, 941 F.3d 767, 788 (5th Cir. 2019) (quoting *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B 1981)).

**1.**

Lightner argues that the government provided no evidence that all the controlled-substance prescriptions from Jomori between May 2017 and August 2018 were unlawful, and that the evidence, in fact, showed that Lightner wrote prescriptions for some patients who actually had pain. Lightner's counsel preserved this sentencing challenge for appeal by raising it during the sentencing hearing.

In making its finding as to drug quantity, "the district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence." *Betancourt*, 422 F.3d at 247

(quoting *United States v. Huskey*, 137 F.3d 283, 291 (5th Cir. 1998)); *Lee*, 966 F.3d at 327 (a district court "may estimate drug quantity" and "can base its findings on 'any information that has "sufficient indicia of reliability to support its probable accuracy," including a probation officer's testimony, a policeman's approximation of unrecovered drugs, and even hearsay'" (quoting *Betancourt*, 422 F.3d at 247)). "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'" *Gentry*, 941 F.3d at 788 (quoting *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (per curiam)). The facts within the PSR must be "supported by an adequate evidentiary basis with sufficient indicia of reliability." *Id.* When that happens, "a defendant must offer rebuttal evidence demonstrating that those facts are 'materially untrue, inaccurate or unreliable.'" *Id.* (quoting *Harris*, 702 F.3d at 230). If the PSR does not bear sufficient indicia of reliability, the district court errs by considering the PSR at sentencing. *Id.*; *see also United States v. Rome*, 207 F.3d 251, 254 (5th Cir. 2000) (per curiam) (noting a PSR does not bear sufficient indicia of reliability when it merely recites the prosecution's case).

The district court accepted the PSR's calculations attributing 41,780 kilograms of converted drug weight (CDW) to Lightner. This amount was based on the number of prescriptions that Lightner wrote for hydrocodone, carisoprodol, and alprazolam using the SureScripts platform between May 2017 and August 2018. Lightner typically used SureScripts to write prescriptions electronically. Although the DEA agent testified that this data is not "a hundred percent accurate" because it can count some prescriptions twice, "those would be isolated incidents." Further, the DEA compared the prescribing data from SureScripts to Lightner's PMP report and found "they were very similar."

"The district court need not rule out every possible alternative conclusion where . . . its drug quality and quantity findings are supported by

the available information." *United States v. Owens*, 94 F.4th 481, 488 (5th Cir.), *cert. denied*, 145 S. Ct. 218 (2024). The government provided sufficient evidence of Lightner's unlawful prescribing practices at Jomori, including Lightner prescribing 97% of his patients a combination of hydrocodone, carisoprodol, and/or alprazolam; charging patients an additional $50 for more than two prescriptions; prescribing patients narcotics even when they tested positive for other controlled substances on their drug screens and negative for the medicines they had been prescribed; and prescribing patients narcotics without a physical examination. *Cf. Gentry*, 941 F.3d at 789 ("Since there is no information with sufficient indicia of reliability to support the district court's conclusion that 56.6 kilograms of meth should be attributed to [the defendant], this finding constituted clear error.").

The three patient-witnesses that Lightner called—Peggy Brown, Ivan Johnson, and Peter Parris, Jr.—do not undercut the government's evidence. *United States v. Evans*, 892 F.3d 692, 707–08 (5th Cir.), *as revised* (July 6, 2018) ("[T]he fact that Evans's patients were in real pain and needed real help does not show that the strong doses of opioids they all received for a sustained period were legitimate."). Two of those witnesses (Brown and Parris) tested negative for their prescriptions on their drug screens, meaning they had not taken the pain medication that Lightner prescribed them. *Cf. Evans*, 892 F.3d at 708 ("The three relevant patients who entrusted their health and care to Evans did not report a meaningful abatement in their pain or increase in function."). Lightner prescribed Johnson opiates even though he tested positive for marijuana on his drug screen and switched Johnson's prescribed medications for no reason.

Given the foregoing, the district court did not clearly err in adopting the PSR's findings for the CDW calculation.

**2.**

Lightner's sentence also included a two-level enhancement under U.S.S.G. § 2D1.1(b)(12), which provides that a defendant's base offense level increases by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Lightner argues that Jomori's "primary or principal use" was not unlawful prescribing because many of its patients testified that they went to Jomori after accidents and to address real pain. Lightner's counsel preserved this sentencing challenge for appeal by raising it during the sentencing hearing.

"Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's *primary or principal* uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Guzman-Reyes*, 853 F.3d at 263 (emphasis added) (quoting U.S.S.G. § 2D1.1 cmt. n.17). This court has recognized that "the evidentiary bar for a premises enhancement is not high." *Ajayi*, 64 F.4th at 250 (collecting cases); *accord United States v. Fonseca*, 834 F. App'x 75, 79 (5th Cir. 2020) (per curiam).

The government surpassed that bar here. Lightner was the sole prescriber at Jomori between May 2017 and August 2018, and during that time, he prescribed 97% of his patients a combination of hydrocodone, carisoprodol, and/or alprazolam. *Ajayi*, 64 F.4th at 250 (holding that "illegal drug transmission was a 'primary or principal' use of [a] pharmacy" when "80% or more of the pharmacy's controlled substances distribution was for prescriptions issued by the doctor involved in the alleged drug conspiracy"). Any data from Lightner's eClinical patient files, which covered Lightner's patient visits *before* the relevant time period of the charged conspiracy, would not change Lightner's prescribing practices from May 2017 to August 2018.

No. 23-20596
c/w No. 23-20600

Lightner also argues that the plain text of U.S.S.G. § 2D1.1(b)(12) cannot apply to "premises involved in healthcare" because the text omits the word "dispense," and medical providers like Lightner only "dispense" drugs, they do not "distribute" drugs. The government argues that Lightner did not raise this argument on appeal, and therefore we should review for plain error. We need not decide whether Lightner preserved this argument because it fails even under the more rigorous standard for preserved arguments.

"'[D]ispense' means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to *the lawful order* of, a practitioner, including the prescribing and administering of a controlled substance." *United States v. Craig*, 823 F. App'x 231, 239 (5th Cir. 2020) (per curiam) (emphasis added) (quoting 21 U.S.C. § 802(10)). Dispensing therefore encompasses prescriptions issued *lawfully*. "'[D]istribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical[.]" *Id.* (quoting 21 U.S.C. § 802(11)). This court has recognized that distributing can encompass unlawful prescribing practices. *Ajayi*, 64 F.4th at 250 (discussing a pharmacy's controlled substances distribution); *Capistrano*, 74 F.4th at 765 n.1 (describing a "pill mill" as "a medical clinic in which practitioners *distribute* controlled substances without 'medical necessity or therapeutic benefit'" (emphasis added) (citing *Lee*, 966 F.3d at 317)); *Craig*, 823 F. App'x at 241 (recognizing that a doctor unlawfully distributes controlled substances when "prescriptions were issued outside the usual course of professional practice and not for a legitimate medical purpose").

Because the jury found sufficient evidence that Lightner issued prescriptions outside the usual course of professional practice and not for a legitimate purpose—in other words, he unlawfully distributed

prescriptions—the district court did not err in applying the two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(12).

**3.**

Lightner's sentence also included a four-level enhancement for an aggravating role. Under U.S.S.G. § 3B1.1(a), the defendant's base offense level increases by four points if a preponderance of the evidence shows that "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a); *United States v. Fillmore*, 889 F.3d 249, 255 (5th Cir. 2018). A district court can impose the enhancement under either theory: (1) five or more participants or (2) otherwise extensive. *United States v. Tuma*, 738 F.3d 681, 693–94 (5th Cir. 2013).

In evaluating whether criminal activity was "otherwise extensive," the court looks at "all persons involved during the course of the entire offense." U.S.S.G. § 3B1.1 cmt. n.3; *Tuma*, 738 F.3d at 694. "This includes taking into account unknowing participants who contributed to the success of the criminal enterprise." *Tuma*, 738 F.3d at 694; *see also* U.S.S.G. § 3B1.1 cmt. n.3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

Lightner argues that he does not qualify for the leadership enhancement "for otherwise extensive criminal activity" because "the Government did not prove that Dr. Lightner's unlawful prescribing permeated [Jomori]" and the district court ignored alternative explanations for Lightner's prescribing practices. Lightner's counsel preserved this sentencing challenge by raising it during the sentencing hearing.

We find this argument unconvincing because as explained in *supra* Parts III.A.2 and III.E.1, the government provided substantial evidence that Lightner's unlawful prescribing practices were extensive. Lightner's scheme

involved multiple people, "both witting and unwitting"—Martinez, the Jomori office staff, and the runners—who contributed to the success of the criminal enterprise, producing $1.2 million in revenue between May 2017 and August 2018. *See Aderinoye*, 33 F.4th at 756. The unknowing participants, Jomori's staff, were essential because without their participation, Lightner could not have seen patients and run Jomori. *Tuma*, 738 F.3d at 694 ("The district court properly focused on the number of people involved in the scheme including the unknowing participants .... These unknowing participants were essential to the crime; without their participation Tuma's activities could not have happened or continued."); *United States v. Davis*, 226 F.3d 346, 360 (5th Cir. 2000) (noting "[t]hose who assisted Davis . . . contributed to the success of the scheme" even though they were unknowing participants). Accordingly, the district court did not clearly err in applying the four-level leadership enhancement under U.S.S.G. § 3B1.1(a).[11]

**4.**

Even if the district court did err in calculating Lightner's sentence, any error is harmless. "A procedural error is harmless if the error did not affect the district court's choice of sentence." *United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018). The party seeking to enforce the error has a "heavy burden" and "high hurdle" to "convincingly demonstrate[] both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.* (quoting *United States v. Ibarra–Luna*, 628 F.3d 712, 714, 717 (5th Cir. 2010)). "The record must show 'clarity of intent' expressed by the district court, but 'such statements do not require magic

---

[11] Because we affirm the district court under the otherwise-extensive theory, we need not address whether the evidence was sufficient to support applying the enhancement under the five-or-more-persons theory.

words.'" *Id.* (quoting *United States v. Shepherd*, 848 F.3d 425, 427 (5th Cir. 2017)).

The district court did not need to utter the magic words that it would have sentenced Lightner the same regardless of the Guidelines calculation; it merely needed to show that its calculations were not based on the Guidelines—which it did. *See Halverson*, 897 F.3d at 652. The district court specifically noted that "a guideline sentence is [not] necessary" and imposed a substantial downward variance "in light of Dr. Lightner's age and his health conditions," 276 months below the minimum of the applicable Guidelines range. *Id.* ("[B]ecause the record reflects that the district court would have imposed the same sentence for the same reasons—namely, because of his lack of criminal history and to prevent Halverson from receiving a death sentence due to his age—we hold that the procedural error was harmless."). Accordingly, even if the district court did err in calculating the CDW and applying the two enhancements to Lightner's sentence, which it did not as explained above, any error was harmless.

## IV.

For the foregoing reasons, we AFFIRM the district court in all respects.